M. T., PLAINTIFF-RESPONDENT, v.
J. T., DEFENDANT-APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted October 14, 1975—Decided March 22, 1976.

Before Judges CARTON, CRAHAY and HANDLER.

*Mr. Charles L. Bertini,* attorney for appellant.

*Mr. Joseph S. Conte,* attorney for respondent.

The opinion of the court was delivered by

HANDLER, J. A. D. This appeal presents the portentous problem of how to tell the sex of a person for marital purposes. Involved is a post-operative transsexual, born a male but now claiming to be a female.

The case started inauspiciously enough when plaintiff M. T. filed a simple complaint in the Juvenile and Domestic Relations Court for support and maintenance. The legal issue sharpened dramatically when defendant J. T.

interposed the defense that M. T. was a male and that their marriage was void. Following a hearing the trial judge determined that plaintiff was a female and that defendant was her husband, and there being no fraud, ordered defendant to pay plaintiff $50-a-week support. Notice of appeal was then filed by defendant.

A careful recapitulation of the testimony is appropriate. M. T. testified that she was born a male. While she knew that she had male sexual organs she did not know whether she also had female organs. As a youngster she did not participate in sports and at an early age became very interested in boys. At the age of 14 she began dressing in a feminine manner and later began dating men. She had no real adjustment to make because throughout her life she had always felt that she was a female.

Plaintiff first met defendant in 1964 and told him about her feelings about being a woman. Sometime after that she began to live with defendant. In 1970 she started to go to Dr. Charles L. Ihlenfeld to discuss the possibility of having an operation so that she could "be physically a woman." In 1971, upon the doctor's advice, she went to a surgeon who agreed to operate. In May of that year she underwent surgery for the removal of male sex organs and construction of a vagina. Defendant paid for the operation. Plaintiff then applied to the State of New York to have her birth certificate changed.

On August 11, 1972, over a year after the operation, plaintiff and defendant went through a ceremonial marriage in New York State and then moved to Hackensack. They lived as husband and wife and had intercourse. Defendant supported plaintiff for over two years when, in October 1974, he left their home. He has not supported plaintiff since.

Dr. Ihlenfeld, plaintiff's medical doctor with a specialty in gender identity, was accepted as an expert in the field of medicine and transsexualism. A transsexual, in the opinion of this expert, was "a person who discovers sometime, usually

very early in life, that there is a great discrepancy between the physical genital anatomy and the person's sense of self-identity as a male or as a female. * * * [T]he transsexual is one who has a conflict between physical anatomy and psychological identity or psychological sex." Usually sexual anatomy was "normal" but for some reason transsexuals did not see themselves as members of the sex their anatomy seemed to indicate. According to Dr. Ihlenfeld, there are different theories to explain the origin of that conflict. There was, however, "very little disagreement" on the fact that gender identity generally is established "very, very firmly, almost immediately, by the age of 3 to 4 years." He defined gender identity as "a sense, a total sense of self as being masculine or female * * *"; it "pervades one's entire concept of one's place in life, of one's place in society and in point of fact the actual facts of the anatomy are really secondary * * *."

The doctor first saw and examined plaintiff in September 1970 and took a medical history from her. She told him that she had always felt like a woman and was living like a woman. She wanted sex reassignment surgery as well as treatments and hormones so that she could end the conflict she was feeling, "confronted with a male body," in order to live her life completely as the woman she thought herself to be. Dr. Ihlenfeld diagnosed her as a transsexual. He knew of no way to alter her sense of her own feminine gender identity in order to agree with her male body, and the only treatment available to her was to alter the body to conform with her sense of psyche gender identity. That regimen consisted of hormone treatment and sex reassignment surgery. Dr. Ihlenfeld recommended such an operation and treated plaintiff both before and after it.

The examination of plaintiff before the operation showed that she had a penis, scrotum and testicles. After the operation she did not have those organs but had a vagina and labia which were "adequate for sexual intercourse" and could function as any female vagina, that is, for "traditional penile/vaginal intercourse." The "artificial vagina" con-

structed by such surgery was a cavity, the walls of which are lined initially by the skin of the penis, often later taking on the characteristics of normal vaginal mucosa; the vagina, though at a somewhat different angle, was not really different from a natural vagina in size, capacity and "the feeling of the walls around it." Plaintiff had no uterus or cervix, but her vagina had a "good cosmetic appearance" and was "the same as a normal female vagina after a hysterectomy." Dr. Ihlenfeld had seen plaintiff since the operation and she never complained to him that she had difficulty having intercourse. So far as he knew, no one had tested plaintiff to find out what chromosomes she had. He knew that plaintiff had had silicone injections in her breasts; he had treated her continuously with female hormones to demasculinize her body and to feminize it at the same time. In the doctor's opinion plaintiff was a female; he no longer considered plaintiff to be a male since she could not function as a male sexually either for purposes of "recreation or procreation."

Plaintiff also produced Charles Annicello, a psychologist who worked at the gender identity clinic of the Johns Hopkins University Hospital. He was qualified as an expert in transsexualism. This witness demonstrated through slides the various methods by which scientists define whether a person is male or female. The witness said that transsexualism represented only one sexual variant although it was not known whether its cause was chromosomal, gonadal or hormonal. Annicello expressed the opinion that if a person had a female psychic gender and underwent a sex reassignment operation, that person would be considerd female although no person is "absolutely" male or female.

Dr. Richard M. Samuels, a Ph.D. with a specialty in behavioral therapy and sexual dysfunctions, testified as an expert in psychology as it related to transsexualism. His definition of a transsexual was essentially the same as that given by the prior experts: "someone whose physical anatomy does not correspond to their [sic] sense of being, to their [sic] sense of gender." He also acknowledged that it was not

known what caused that condition but he believed that it was probably a combination of neurological, chromosomal and environmental factors. Some psychological changes are noted following a sex reassignment operation. Thus, a transsexual was often depressed pre-operatively, but after the operation he or she lived a "fuller and richer life" and was better able to overcome obstacles in employment, housing, social security and welfare benefits; a sense of satisfaction and relief was felt since the body was now in line with the psyche. For Dr. Samuels the most important factor in determining whether a person should have a sex reassignment operation was how consistently the patient lived in the chosen gender role. A sex reassignment operation did not determine a person's gender. After a transsexual underwent a sex reassignment operation to remove male organs, Dr. Samuels would characterize that person as a female.

Defendant called as an expert witness Dr. T, a medical doctor who was defendant's adoptive father. Over plaintiffs objection he was allowed to testify as an expert. Dr. T classified sex at birth according to sexual anatomy. He described a female as "a person who has female organs in an anatomical sense, who has a vagina and a uterus and ovaries or at least has had them." The witness had heard all of the prior testimony and he said that in his opinion plaintiff was still a male because she did not have female organs. He did believe, however, that transsexuals existed and that they were people who had "the mental and emotional reactions of the opposite sex." On cross-examination Dr. T reiterated that it was the anatomy alone which determined the real sex of an individual and that gender in contrast to sex was not a significant factor. Although he was "very sympathetic to any male person" who had "the emotional and mental reactions of a female," since he knew that it was "very annoying," he still did not believe that that was determinative.

The trial judge made careful findings of fact on this evidential record. He accepted the testimony concerning M.T.'s personal and medical history as related by her and her doc-

tor. He noted that defendant knew of her condition and co-operated in her sex reassignment surgery. The parties married in New York and subsequently consummated their marriage by engaging in sexual intercourse. The judge also found that defendant later deserted plaintiff and failed to support her.

Drawing from the opinions of the experts the judge defined a transsexual as "an individual anatomically of one sex who firmly believes he belongs to the other sex." He enumerated the seven factors considered generally relevant to the determination of sex. According to the judge, a preoperative transsexual would appropriately be classified according to his anatomical sex. After a successful sex reassignment operation, however, "psychological sex and anatomical sex become consistent as to outward appearances." The judge ruled that plaintiff was of the female psychic gender all her life and that her anatomical change through surgery required the conclusion that she was a female at the time of the marriage ceremony. He stated:

It is the opinion of the court that if the psychological choice of a person is medically sound, not a mere whim, and irreversible sex reassignment surgery has been performed, society has no right to prohibit the transsexual from leading a normal life. Are we to look upon this person as an exhibit in a circus side show? What harm has said person done to society? The entire area of transsexualism is repugnant to the nature of many persons within our society. However, this should not govern the legal acceptance of a fact. * * *

Defendant's basic and continuing contention is that the marriage between him and plaintiff was a nullity because plaintiff was a male at the time of the ceremony. We disagree with this position and affirm the decision of the lower court.

■ We accept — and it is not disputed — as the fundamental premise in this case that a lawful marriage requires the performance of a ceremonial marriage of two persons of the opposite sex, a male and a female. Despite winds of

change, this understanding of a valid marriage is almost universal. Annotation, "Marriage Between Persons of Same Sex," 63 *A. L. R.* 3d 1199 (1975). In the matrimonial field the heterosexual union is usually regarded as the only one entitled to legal recognition and public sanction. 52 *Am. Jur.* 2d, *Marriage,* §1 at 865; *e. g. Singer v. Hara,* 11 *Wash. App.* 247, 522 *P.* 2d 1187 (App. Ct. 1974); *B. v. B.,* 78 *Misc.* 2d 112, 355 *N. Y. S.* 2d 712 (Sup. Ct. 1974); *Jones v. Hallahan,* 501 *S. W.* 2d 588 (Ky. Ct. App. 1973); *Baker v. Nelson,* 291 *Minn.* 310, 191 *N. W.* 2d 185 (Sup. Ct. 1971), app. dism. 409 *U. S.* 810, 93 *S. Ct.* 37, 34 *L. Ed.* 2d 65 (1972).

There is not the slightest doubt that New Jersey follows the overwhelming authority.[1] The historic assumption in the application of common law and statutory strictures relating to marriages is that only persons who can become "man and wife" have the capacity to enter marriage. *Cf. Winn v. Wiggins,* 47 *N. J. Super.* 215, 220 (App. Div. 1957); *Jackson v. Jackson,* 94 *N. J. Eq.* 233, 236-237 (E. & A. 1922); *N. J. S. A.* 37:1-10. The pertinent statutes relating to marriages and married persons do not contain any explicit references to a requirement that marriage must be between a man and a woman. *N. J. S. A.* 37:1-1 *et seq.; N. J. S. A.* 2A: 34-1 *et seq.* Nevertheless that statutory condition must be extrapolated. It is so strongly and firmly implied from a full reading of the statutes that a different legislative intent,

---

[1] No issue was raised below or on appeal as to the state law applicable to this case. Our courts would generally look to the law of the place of the marriage ceremony to determine its validity unless contrary to public policy. *Booker v. James Spence Iron Foundry,* 80 *N. J. Super.* 68, 77–78 (App. Div. 1963); *Winn v. Wiggins,* 47 *N. J. Super.* 215, 220 (App. Div. 1957). We have examined independently the statutory law of the State of New York (New York Domestic Relations Law, §§ 5 through 25) and are satisfied that by its literal terms the marriage in this case would not by statute be prohibited. The current decisional law of New York, discussed *infra,* is not dispositive of the legal issue as to whether this marriage would be void or voidable in that state. Hence, we are free to apply the law of the State of New Jersey.

one which would sanction a marriage between persons of the same sex, cannot be fathomed.

The issue must then be confronted whether the marriage between a male and a postoperative transsexual, who has surgically changed her external sexual anatomy from male to female, is to be regarded as a lawful marriage between a man and a woman.

An English case, *Corbett v. Corbett*, 2 *W. L. R.* 1306, 2 *All E. R.* 33 (P. D. A. 1970) appears to be the only reported decision involving the validity of marriage of a true postoperative transsexual and a male person. The judge there held that the transsexual had failed to prove that she had changed her sex from male to female. The court subscribed to the opinion of the medical witnesses that "the biological sexual constitution of an individual is fixed at birth (at the latest), and cannot be changed, either by the natural development of organs of the opposite sex, or by medical or surgical means. The respondent's operation, therefore, cannot affect her true sex." 2 *W. L. R.* at 1323. It felt that three tests for sex should be used, the chromosomal, gonadal and genital, and when these were congruent sex for purposes of marriage should be determined accordingly. *Id.* at 1325. And, in view of the "essentially hetero-sexual character" of marriage, the test to determine sex must be biological, "for even the most extreme degree of transsexualism in a male or the most severe hormonal imbalance which could exist in a person with male chromosomes, male gonads, and male genitalia, cannot reproduce a person who is naturally capable of performing the essential role of a woman in marriage." *Id.* at 1324-1325. Based upon an assumed distinction between "sex" and "gender," the court held that "marriage is a relationship which depends on sex and not on gender." *Id.* at 1325. In addition, the judge was mindful that the marriage was unstable, brief and the sexual exchange between the parties — the husband was a transvestite — was ambivalent. He concluded on alternative grounds that the marriage had not been, and indeed could not be, consummated.

We cannot join the reasoning of the *Corbett* case. The evidence before this court teaches that there are several criteria or standards which may be relevant in determining the sex of an individual. It is true that the anatomical test, the genitalia of an individual, is unquestionably significant and probably in most instances indispensable. For example, sex classification of an individual at birth may as a practical matter rely upon this test. For other purposes, however, where sex differentiation is required or accepted, such as for public records, service in the branches of the armed forces, participation in certain regulated sports activities, eligibility for types of employment and the like, other tests in addition to genitalia may also be important. Comment, "Transsexualism, Sex Reassignment Surgery, and the Law," 56 *Cornell L. Rev.* 963, 992–1002 (1971).

Against the backdrop of the evidence in the present record we must disagree with the conclusion reached in *Corbett* that for purposes of marriage sex is somehow irrevocably cast at the moment of birth, and that for adjudging the capacity to enter marriage, sex in its biological sense should be the exclusive standard. On this score the case has not escaped critical review. Comment, *supra*, 56 *Cornell L. Rev.* at 1003–1007; Note, "Transsexuals in Limbo," 31 *Md. L. Rev.* 236, 244 (1971).

Our departure from the *Corbett* thesis is not a matter of semantics. It stems from a fundamentally different understanding of what is meant by "sex" for marital purposes. The English court apparently felt that sex and gender were disparate phenomena. In a given case there may, of course, be such a difference. A preoperative transsexual is an example of that kind of disharmony, and most experts would be satisfied that the individual should be classified according to biological criteria. The evidence and authority which we have examined, however, show that a person's sex or sexuality embraces an individual's gender, that is, one's self-image, the deep psychological or emotional sense of sexual identity and character. Indeed, it has been observed that the "psycho-

logical sex of an individual," while not serviceable for all purposes, is "practical, realistic and humane." Comment, *supra,* 56 *Cornell L. Rev.* at 969–970; *cf. In re Anonymous,* 57 *Misc.* 2d 813, 293 *N. Y. S.* 2d 834, 837 (Civ. Ct. 1968).

The English court believed, we feel incorrectly, that an anatomical change of genitalia in the case of a transsexual cannot "affect her true sex." Its conclusion was rooted in the premise that "true sex" was required to be ascertained even for marital purposes by biological criteria. In the case of a transsexual following surgery, however, according to the expert testimony presented here, the dual tests of anatomy and gender are more significant. On this evidential demonstration, therefore, we are impelled to the conclusion that for marital purposes if the anatomical or genital features of a genuine transsexual are made to conform to the person's gender, psyche or psychological sex, then identity by sex must be governed by the congruence of these standards.

Implicit in the reasoning underpinning our determination is the tacit but valid assumption of the lower court and the experts upon whom reliance was placed that for purposes of marriage under the circumstances of this case, it is the sexual capacity of the individual which must be scrutinized. Sexual capacity or sexuality in this frame of reference requires the coalescence of both the physical ability and the psychological and emotional orientation to engage in sexual intercourse as either a male or a female.

Other decisions touching the marital status of a putative transsexual are not especially helpful. *Anonymous v. Anonymous,* 67 *Misc.* 2d 982, 325 *N. Y. S.* 2d 499 (Sup. Ct. 1971), cited by defendant, held a marriage a nullity, but there the two persons had never had sexual intercourse and had never lived together. Although it was claimed that respondent was a transsexual and had had an operation to remove his male organs after the marriage, there was no medical evidence of this. In *B. v. B., supra,* a female transsexual had had a hysterectomy and mastectomy but had not received any male

organs and was incapable of performing sexually as a male. He had then married a normal female who later sued for an annulment on the ground that he had defrauded her by not informing her of his transsexualism and of the operation. The judge there held that even if defendant were a male and trapped in the body of a female, his attempted sex reassignment surgery had not successfully released him from that body.

*Anonymous v. Weiner,* 50 *Misc.* 2d 380, 270 *N. Y. S.* 2d 319 (Sup. Ct. 1966), sustained the refusal by the New York City Board of Health to amend a sex designation on a birth certificate. The court acquiesced in the view of the administrative agency that "male-to-female transsexuals are still chromosomally males while ostensibly females" and that the desire of the transsexual for "concealment of a change of sex * * * is outweighed by the public interest for protection against fraud." 270 *N. Y. S.* 2d at 322. To reiterate, the chromosomal test of sex in this context is unhelpful. The potential for fraud, feared by the court, moreover, is effectively countered by the apt observation of the trial judge here: "The transsexual is not committing a fraud upon the public. In actuality she is doing her utmost to remove any false facade." Further, we note the *Weiner* case was sharply criticized in *re Anonymous, supra,* which ordered a change to a female name for a postoperative transsexual. The court concluded that the chromosomal test recommended by the New York Academy of Medicine and adopted by the court in *Weiner* was unrealistic and inhumane. It said:

It has been suggested that there is some middle ground between the sexes, a "no-man's land" for those individuals who are neither truly "male" nor truly "female." Yet the standard is much too fixed for such far-out theories. Rather the application of a simple formula could and should be the test of gender, and that formula is as follows: Where there is disharmony between the psychological sex and the anatomical sex, the social sex or gender of the individual will be determined by the anatomical sex. Where, however, with or without medical intervention, the psychological sex and the anatomical sex are harmonized, then the social sex or gender of the individual should be made to conform to the harmonized status

of the individual and, if such conformity requires changes of a statistical nature, then such changes should be made. Of course, such changes should be made only in those cases where physiological orientation is complete. [293 *N. Y. S.* 2d at 837]

Another case, *Hartin v. Director of the Bureau of Records, etc.,* 75 *Misc.* 2d 229, 347 *N. Y. S.* 2d 515 (Sup. Ct. 1973), also rejected the request of a transsexual to amend a birth certificate. The court noted the administrative finding that a sex reassignment operation is "an experimental form of psychotherapy * * * mutilating surgery * * * that nonetheless does not change the body cells governing sexuality." 347 *N. Y. S.* 2d at 518. That reasoning, as well as the earlier *Weiner* decision, has been characterized as unsound and inadequate. Note, "Law and Transsexualism: A Faltering Response to a Conceptual Dilemma," 7 *Conn. L. Rev.* 288 (1975). Support for the views there expressed cannot be squared with the conclusions imposed by the record in this case.

█ In sum, it has been established that an individual suffering from the condition of transsexualism is one with a disparity between his or her genitalia or anatomical sex and his or her gender, that is, the individual's strong and consistent emotional and psychological sense of sexual being. A transsexual in a proper case can be treated medically by certain supportive measures and through surgery to remove and replace existing genitalia with sex organs which will coincide with the person's gender. If such sex reassignment surgery is successful and the postoperative transsexual is, by virtue of medical treatment, thereby possessed of the full capacity to function sexually as a male or female, as the case may be, we perceive no legal barrier, cognizable social taboo, or reason grounded in public policy to prevent that person's identification at least for purposes of marriage to the sex finally indicated.

█ In this case the transsexual's gender and genitalia are no longer discordant; they have been harmonized through medical treatment. Plaintiff has become physically and

psychologically unified and fully capable of sexual activity consistent with her reconciled sexual attributes of gender and anatomy. Consequently, plaintiff should be considered a member of the female sex for marital purposes. It follows that such an individual would have the capacity to enter into a valid marriage relationship with a person of the opposite sex and did do so here. In so ruling we do no more than give legal effect to a *fait accompli,* based upon medical judgment and action which are irreversible. Such recognition will promote the individual's quest for inner peace and personal happiness, while in no way disserving any societal interest, principle of public order or precept of morality.

Accordingly, the court below correctly determined that plaintiff at the time of her marriage was a female and that defendant, a man, became her lawful husband, obligated to support her as his wife. The judgment of the court is therefore affirmed.