777 A.2d 365 (2001)
342 N.J. Super. 501
Carla ENRIQUEZ, M.D., Plaintiff-Appellant,
v.
WEST JERSEY HEALTH SYSTEMS, West Jersey Center for Behavior Learning & Attention, West Jersey Physicians Assoc., a/k/a West Jersey Clinical Association, Center for Family Guidance, Les Pascal, James Varrell, M.D., John P. Cossa, M.D., Richard Miller, Maureen Miller, Ellen Feinstein, Greg Maddison, Ed Dunn, Kevin Manley, and Tony Chigounis, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued May 31, 2001.
Decided July 3, 2001.
*367 Arthur B. Jarrett, of the Pennsylvania bar, Philadelphia, admitted pro hac vice, argued the cause for appellant (James & Jarrett, attorneys; Mr. Jarrett and Walter D. Schirrmacker, also of the Pennsylvania bar and also admitted pro hac vice, and Brem Moldovsky, on the brief).
William M. Honan, Atlantic City, argued the cause for respondents West Jersey Health Systems, West Jersey Center Behavior, Learning & Attention, West Jersey Clinical Assoc., John Cossa, M.D., Richard Miller, Maureen Miller, Ellen Feinstein, Greg Maddison, Ed Dunn, Kevin Manley and Tony Chigounis (Fox, Rothschild, O'Brien & Frankel, attorneys; Mr. Honan, of counsel; Mr. Honan and Kathryn D. Portner, on the brief).
Darren H. Goldstein argued the cause for respondents Family Guidance Center, Les Pascal & James Varrell, M.D. (Speziali, Greenwald, Goldstein & Hawkins, attorneys; Mr. Goldstein, on the brief).
Before Judges KING, LEFELT and AXELRAD.
*366 The opinion of the court was delivered by LEFELT, J.A.D.
These consolidated appeals arise from the summary judgment dismissal of two complaints filed by plaintiff Carla Enriquez, a male-to-female transsexual, for wrongful termination of her employment as medical director of a learning behavior center owned and managed by the various corporate and individual defendants. Most significantly, this appeal raises the novel issues of whether gender dysphoria or transsexualism is a handicap under the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 through -49 ("LAD"), and whether the LAD precludes an employer from discriminating on the basis of someone's sexual identity or gender. We answer both questions in the affirmative and reverse and remand for further proceedings.

I.
We recount only those portions of the procedural history and facts necessary to explain our resolution of the issues raised in these consolidated appeals. Plaintiff was born a biological male and, until February 1998, was legally known as "Carlos." Plaintiff is a licensed New Jersey physician who was in the private practice of general and developmental pediatrics from 1974 to 1995.
On November 20, 1995, defendant West Jersey Health Systems ("West Jersey") hired plaintiff as medical director of defendant outpatient treatment facility, West Jersey Center for Behavior, Learning and Attention ("Center"). Plaintiff and West Jersey entered into a written Professional Services Agreement that could be terminated by either party upon ninety days' written notice.
*368 In September 1996, less than a year after plaintiff's employment with West Jersey commenced, she began the external transformation from male to female. Plaintiff shaved her beard and eventually removed all vestiges of facial hair. She sculpted and waxed her eyebrows, pierced her ears, started wearing emerald stone earrings, and began growing breasts.
In the early months of 1997, plaintiff was confronted by defendants John Cossa, Maureen Miller, and Ellen Feinstein regarding their discomfort over her transformation. Cossa was West Jersey's vice president and president and chief executive officer of defendant West Jersey Clinical Association, also known as defendant West Jersey Physicians' Associates ("Physicians' Associates"), the entity which assumed control of the Center's professional staff in September 1997. Miller was vice president of outpatient services at West Jersey and Feinstein was her assistant.
By February 1997, plaintiff began manicuring and polishing her nails, growing long hair, and wearing a ponytail. On February 13, 1997, Cossa expressly questioned plaintiff about her appearance. According to plaintiff, Cossa asked if plaintiff would be willing to go back to her prior appearance if West Jersey asked her to. Cossa told plaintiff, "stop all this and go back to your previous appearance!"
In June 1997, plaintiff was diagnosed with gender dysphoria, which is a gender identity disorder listed in the Diagnostic and Statistical Manual of Mental Disorders, (fourth edition, 1994)("DSM-IV"), published by the American Psychiatric Association. This disorder is also known as transsexualism.
On July 22, 1997, plaintiff received a letter from Miller stating that the hospital, pursuant to the professional services agreement, was terminating the agreement, without cause, effective in ninety days, on October 22, 1997. According to this letter, the Center's program was being assumed by Physicians' Associates as of the end of October. Plaintiff was advised that she would be contacted by Cossa to discuss a new contract with that entity.
From July 22 to September 29, 1997, plaintiff repeatedly tried to discuss a new contract with Cossa, without any success. Plaintiff claimed that as of September 1997, all of the other professional staff employed at the Center had become employees of Physicians' Associates.
On September 29, 1997, when plaintiff finally met with Cossa regarding a new contract for plaintiff, Cossa advised plaintiff that "[N]o one's going to sign this contract unless you stop this business that you're doing."
When Cossa and plaintiff next met, on October 13, plaintiff presented Cossa with a letter she had drafted to her family and patients, explaining her gender identity disorder and the treatment she was following. She had not yet sent the letter to anyone. Cossa asked plaintiff not to say anything yet and to let Cossa try to work things out.
On October 22, 1997, Cossa handed plaintiff a termination letter. According to this letter, Cossa and plaintiff had discussed the possibility of moving plaintiff to Physicians' Associates. However, defendants decided not to pursue that option and had made arrangements for other doctors to be available immediately to provide care to the Center's patients.
Cossa told plaintiff that the hospital would not allow plaintiff to send her proposed letter to the patients, and that the hospital had drafted a different letter. Plaintiff was also told not to return to the office for the rest of that day and that her *369 patients had been canceled for the next three months.
In February 1998, plaintiff legally changed her name to Carla. In July 1998, approximately nine months after she was terminated, plaintiff underwent the surgical procedure to become a female. Plaintiff stated that while she was a man, she was not gay and was not sexually attracted to other men. No one at West Jersey ever accused plaintiff of being gay. Since her surgery, plaintiff has continued to live as a "spouse" with Monica, to whom plaintiff was married while she was a man. Plaintiff believes, according to her deposition testimony, that Monica is a lesbian. Plaintiff believes that the course of treatment she began, that ended with sex reassignment surgery, cured her gender dysphoria.
In December 1998, plaintiff filed her first complaint against defendants for disability discrimination under the LAD, gender or sexual orientation-affection discrimination under the LAD, breach of contract, and trade libel. The West Jersey defendants filed a motion for partial summary judgment, seeking dismissal of plaintiff's claim for disability discrimination. The motion judge granted defendant's motion, noting that other courts had concluded that transsexualism was not a recognized mental or physical disability under statutes very similar to ours.
Thereafter, all defendants moved for summary judgment seeking dismissal of the remainder of plaintiff's claims. Before these motions could be heard, plaintiff filed a separately docketed complaint on October 21, 1999, naming the same defendants and reciting the same factual allegations. This complaint, however, alleged causes of action for intentional interference with a contractual relationship, conspiracy, wrongful refusal to continue a business, and unjust enrichment.
In dealing with the summary judgment motions made by all defendants regarding the remaining counts of plaintiff's first complaint, the motion judge found that plaintiff could not bring a claim for sexual orientation discrimination because plaintiff admitted that, while she was a male, she was not gay and was never accused of being gay. The judge did not believe that the Legislature has provided any remedy for persons who elected to change their sex.
The judge dismissed the breach of contract claim on the ground that plaintiff's employment contract contained a ninetyday termination provision. With regard to the trade libel claim, the judge noted that plaintiff had refused to identify those patients she claimed had been told by defendants that something was wrong with plaintiff and that plaintiff was no longer practicing medicine. The judge acknowledged that plaintiff had submitted two affidavits in opposition to summary judgment, but did not comment on whether these affidavits would alter his decision.
The affidavits that plaintiff had submitted in opposition to the summary judgment motion were from the parents of two patients. According to one parent, after plaintiff's termination, West Jersey told her that they had no idea where plaintiff was. The parent was also told that plaintiff might have stopped practicing medicine and that the parent should look for a new doctor for her child.
The affidavit from the other parent was similar. In addition to telling this parent that they had no idea where plaintiff went, defendants also said that plaintiff was going through some personal issues and would probably not be practicing medicine anymore.
In February 2000, all defendants moved for a summary judgment dismissal of plaintiff's second complaint. In granting *370 these motions, a different motion judge concluded that the second complaint was a "repackaging" of the first complaint, which had been dismissed by the first motion judge.
Plaintiff appealed from the summary judgments dismissing the two complaints, and we consolidated the two appeals. In addition to contesting the dismissal of the entire first complaint, only two of the causes of action alleged by plaintiff in the second complaint, interference with economic opportunity and unjust enrichment, are being challenged in the appeal.

II.
We first detail what the record discloses concerning plaintiff's gender dysphoria or transsexualism. Essentially, plaintiff claimed that she felt like a woman trapped in a man's body from a very early age, and that she was called upon to act manly even though she did not feel masculine. This is consistent with general clinical findings regarding other transsexuals. "Transsexuals do not alternate between gender roles; rather, they assume a fixed role of attitudes, feelings, fantasies, and choices consonant with those of the opposite sex, all of which clearly date back to early development." Current Medical Diagnosis & Treatment 928 (Lawrence M. Tierney, Jr. et al. eds., 35th ed.1996).
Though plaintiff is a physician, she did not diagnose herself. Dr. William Stayton from the University of Pennsylvania formally diagnosed plaintiff's condition. Plaintiff claims Dr. Stayton is an "internationally renowned expert in gender and sexual medicine." According to the letter plaintiff wanted to send her patients explaining her situation, there are "internationally accepted norms for treatment of this condition." These encompass the steps that plaintiff went through including "extensive psychological counseling, extended planning for `transition,' the use of contrahormonal therapy, hair removal, living in the putative gender role full time (the so called `Real Life Test') and finally, in some cases, sex reassignment surgery."
Also in the letter she planned to send her patients, plaintiff further explained gender dysphoria in this fashion:
Current research tells us that early in fetal development, the infant's brain undergoes masculinization or feminization unrelated to chromosomal complement. Later, as we grow up, we identify with the `cortical' or brain gender we were endowed with. Happily, for the majority of the population, the genetic (or chromosomal gender) and the cortical (or brain gender) are congruent. Later in development, we develop sexual preferences, sexual orientation, gender attribution, and gender function. Again, in the majority of the population, all of these are congruent and society and the individual are happy.
But some people do not have this harmony. We call these feelings `dysphoria' in medicine. Literally, this means `unhappy,' but doctors have expanded its meaning to describe conditions that significantly effect the individual. Gender Dysphoria describes a condition in which there is not this harmony. The physical and the inner selves are at odds.
Plaintiff argues that the court erred in dismissing her claim of discrimination based on either gender or sexual orientation/affection. The LAD provides in pertinent part that it is unlawful for an employer to terminate someone's employment based on that person's "affectional or sexual orientation, genetic information, sex or atypical hereditary cellular or blood trait," N.J.S.A. 10:5-12(a). The part of the LAD dealing with "affectional or sexual orientation" was added by the Legislature *371 in 1992. L. 1991, c. 519, § 8, effective January 19, 1992.
"`Affectional or sexual orientation' means male or female heterosexuality, homosexuality or bisexuality by inclination, practice, identity or expression, having a history thereof or being perceived, presumed or identified by others as having such an orientation." N.J.S.A. 10:5-5(hh). "Heterosexuality" is defined as affectional, emotional or physical attraction or behavior primarily directed towards persons of the other gender, "homosexuality" is directed towards persons of the same gender, and "bisexuality" is directed towards persons of either gender. N.J.S.A. 10:5-5(ii)-(kk).
We conclude that plaintiff failed to establish a prima facie case for discrimination based on her affectional or sexual orientation because she was not a homosexual or bisexual or perceived to be homosexual or bisexual. This portion of the statute refers to one's relations with others and not to his or her own sexual identity, and plaintiff presented no evidence that she was discriminated against because of her "affectional, emotional or physical attraction" to others.
Plaintiff's complaint, however, also included a claim for gender discrimination. Plaintiff specifically charged that her "sexual affectation and/or orientation and/or gender, real or as perceived by the defendants was and is a determining factor in connection with defendants ongoing discriminatory, retaliatory and harassing treatment of Plaintiff." Thus, we proceed to consider whether plaintiff has set forth a viable LAD cause of action based on her gender.
We note preliminarily that the LAD bars discrimination on the basis of "sex" and gender is not specifically mentioned in the law. "Sex" is generally understood to mean "whether a person is anatomically male or female." Taylor Flynn, Transforming the Debate: Why We Need to Include Transgender Rights in the Struggles for Sex and Sexual Orientation Equality, 101 Colum. L.Rev. 392, 394 (2001). Gender is "whether a person has qualities that society considers masculine or feminine." Ibid.
Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e-2(a)(1), does not contain language barring discrimination based on one's affectional or sexual orientation. Moreover, the federal courts construing Title VII have unanimously concluded that discrimination on the basis of gender dysphoria is not sex discrimination. Basically, the federal courts conclude that discrimination on the basis of sex outlaws discrimination against women because they are women, and against men because they are men. E.g., Ulane v. E. Airlines, Inc., 742 F.2d 1081, 1085 (7th Cir.1984), cert. denied, 471 U.S. 1017, 105 S.Ct. 2023, 85 L.Ed. 2d 304 (1985); Sommers v. Budget Mktg., Inc., 667 F.2d 748, 750 (8th Cir.1982); Holloway v. Arthur Andersen & Co., 566 F.2d 659, 662-63 (9th Cir.1977); Grossman v. Bernards Tp. Bd. of Educ., 11 Fair Empl. Prac. Cas. (BNA) 1196 (D.N.J.1975), aff'd, 538 F.2d 319 (3d Cir.), cert. denied, 429 U.S. 897, 97 S.Ct. 261, 50 L.Ed.2d 181 (1976).
In 1989, however, the United States Supreme Court signaled a possible change in the federal approach to gender dysphoria. In Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), the Court held that Title VII barred discrimination of a woman who failed to "act like a woman" or to conform to sociallyconstructed gender expectations. This approach would seem to indicate that the word "sex" in Title VII encompasses both gender and sex, and forbids discrimination because of one's failure to act in a way *372 expected of a man or a woman. Schwenk v. Hartford, 204 F.3d 1187, 1201-02 (9th Cir.2000). The United States Supreme Court has stated that Congress, in barring discrimination based on sex, "intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes." Price Waterhouse v. Hopkins, supra, 490 U.S. at 251, 109 S.Ct. at 1791, 104 L.Ed.2d at 288 (citation omitted). Again, as further evidence of this change in approach, Rosa v. Park West Bank & Trust Co., 214 F.3d 213 (1st Cir.2000), found under the Equal Credit Opportunity Act, 15 U.S.C. § 1691 (1994), that discrimination against a man because he was wearing a dress could constitute sex discrimination. Id. at 214.
The states are split on this issue. For example, in Sommers v. Iowa Civil Rights Comm'n, 337 N.W.2d 470, 474 (Iowa 1983), the Iowa Supreme Court concluded that the word "sex" in Iowa's Civil Rights Act did not include transsexuals and that sexual discrimination was intended to prohibit conduct which, had the victim been a member of the opposite sex, would not have otherwise occurred.
Similarly, in James v. Ranch Mart Hardware, Inc., 881 F.Supp. 478, 481, n. 4 (D.Kan.1995) (applying Kansas law), the federal court held that under the Kansas Act Against Discrimination, a male-to-female transsexual could not sue for discrimination. Moreover, because male employees constituted the "majority," the plaintiff had to prove a case of "reverse" discrimination, that is, that her employer was the rare employer who discriminated against the majority. Id. at 481.
In Underwood v. Archer Mgmt. Servs., Inc., 857 F.Supp. 96, 98 (D.D.C.1994), the court, applying local federal law, held that "sex" in the District of Columbia's Human Rights Act did not include transsexuality because the District's Commission on Human Rights had defined the term to mean the state of being male or female and the conditions associated therewith. Moreover, although the statute also included a prohibition against sexual orientation discrimination, transsexuality was not the same thing as homosexuality, and the complaint had been devoid of any reference to plaintiff's sexual orientation. Ibid.
We disagree with the rationale of these decisions. A person who is discriminated against because he changes his gender from male to female is being discriminated against because he or she is a member of a very small minority whose condition remains incomprehensible to most individuals. The view of sex discrimination reflected in these decisions is too constricted.
Rather, we believe that the New York case Maffei v. Kolaeton Indus., Inc., 164 Misc.2d 547, 626 N.Y.S.2d 391 (Sup.Ct. 1995), is better reasoned. In Maffei, a state law prohibited sex discrimination and a city law also prohibited sexual orientation discrimination. Id. at 392. The court agreed with the reasoning of Underwood that sexual orientation discrimination did not apply to a transsexual because such discrimination dealt only with the sex of the person's sexual partner. Id. at 393.
However, in concluding that discrimination against a transsexual constituted sex discrimination, the New York court held that the contrary holdings of the federal courts under Title VII were unduly restrictive and should not be followed in interpreting state and local statutes. Id. at 394-95. Although the city statute used the term "gender" whereas the state statute used the term "sex," the court held that harassment based on the fact an employee changed his sexual status also constituted sex discrimination. Id. at 395-96. Such behavior was similar to harassment based on one's secondary sexual characteristics. Id. at 396.
*373 The Minnesota Human Rights Act is unique because it is one of the only state statutes to include in its definition of sexual orientation, "having or being perceived as having ... a self-image or identity not traditionally associated with one's biological maleness or femaleness." Minn.Stat. § 363.01, subd. 45 (added by L. 1993, c. 22, §§ 1, 2). In Goins v. West Group, 619 N.W.2d 424, 428 (Minn.Ct.App.2000), this statute was held to include within its protected class an individual who was born male, who changed her legal name to that of a female, and who took female hormones to identify herself as a female, even though she elected not to undergo sexual reassignment surgery. Id. at 426, 428.
We conclude that the reasoning reflected in Goins, Maffei, as well as Price Waterhouse, Schwenk, and Rosa is more closely connected to our own state's historic policy of liberally construing the LAD. Fraser v. Robin Dee Day Camp, 44 N.J. 480, 486, 210 A.2d 208 (1965). There is also some New Jersey support for the position that precluding discrimination on the basis of sex also precludes gender discrimination.
In Zalewski v. Overlook Hosp., 300 N.J.Super. 202, 692 A.2d 131 (Law Div. 1996), Judge Menza decided that the LAD applied to sexual harassment of a heterosexual male by other heterosexual males when the harassment was based on gender stereotyping. In Zalewski, the plaintiff's coworkers harassed him because they thought he was a virgin. They never suggested his sexual orientation was anything other than heterosexual and there was no evidence that he was homosexual or bisexual. Id. at 203-04, 692 A.2d 131. Nevertheless, Judge Menza found a violation and noted that we should not "condone severe sexual harassment of a person because he is perceived or presumed to be less than someone's definition of masculine." Id. at 211, 692 A.2d 131.
A generation ago, when Justice Handler served in the Appellate Division, he found that "[t]he evidence and authority which we have examined, however, show that a person's sex or sexuality embraces an individual's gender, that is, one's self-image, the deep psychological or emotional sense of sexual identity and character." M.T. v. J.T., 140 N.J.Super. 77, 86, 355 A.2d 204 (App.Div.), certif. denied, 71 N.J. 345, 364 A.2d 1076 (1976). We agree with Justice Handler that "sex" embraces an "individual's gender," and is broader than anatomical sex. "[S]ex is comprised of more than a person's genitalia at birth." Flynn, supra, 101 Colum. L.Rev. at 415. The word "sex" as used in the LAD should be interpreted to include gender, protecting from discrimination on the basis of sex or gender.
It is incomprehensible to us that our Legislature would ban discrimination against heterosexual men and women; against homosexual men and women; against bisexual men and women; against men and women who are perceived, presumed or identified by others as not conforming to the stereotypical notions of how men and women behave, but would condone discrimination against men or women who seek to change their anatomical sex because they suffer from a gender identity disorder. We conclude that sex discrimination under the LAD includes gender discrimination so as to protect plaintiff from gender stereotyping and discrimination for transforming herself from a man to a woman.

III.
Plaintiff also contends that gender dysphoria is a handicap and a recognized disability under the LAD. It is unlawful to discriminate against an employee because *374 of a handicap "unless the nature and extent of the handicap reasonably precludes the performance of the particular employment." N.J.S.A. 10:5-4.1. The LAD has defined "handicapped" as:
suffering from physical disability, infirmity, malformation or disfigurement which is caused by bodily injury, birth defect or illness, ... or from any mental, psychological or developmental disability resulting from anatomical, psychological, physiological or neurological conditions which prevents the normal exercise of any bodily or mental functions or is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques....

[N.J.S.A. 10:5-5(q).]
In this case we are not dealing with any "physical disability, infirmity, malformation or disfigurement which is caused by bodily injury, birth defect or illness." We are dealing with the portion of the statute that provides that a person can be handicapped if they suffer from a "mental, psychological or developmental disability resulting from anatomical, psychological, physiological or neurological conditions which prevents the normal exercise of any bodily or mental functions or is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques."
Plaintiff is, however, relying exclusively on the clinical or laboratory diagnostic portion of the definition. She does not argue that transsexualism prevented the normal exercise of any bodily or mental functions. And, according to plaintiff, her condition did not interfere with the adequate performance of her work at the Center. Termination of a "handicapped" employee, whose condition does not prevent the employee from doing her job, is actionable under the LAD. Gimello v. Agency Rent-A-Car Sys., Inc., 250 N.J.Super. 338, 365, 594 A.2d 264 (App.Div.1991).
Therefore, in this case plaintiff asks us to determine whether gender dysphoria is a handicap and protected by the LAD because it is a "mental, psychological or developmental disability resulting from anatomical, psychological, physiological or neurological conditions which ... is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques."
As remedial social legislation, the LAD is deserving of a liberal construction, especially with regard to handicaps. Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 590, 538 A.2d 794 (1988); Andersen v. Exxon Co., U.S.A., 89 N.J. 483, 495, 446 A.2d 486 (1982). The statutory definition of handicapped under N.J.S.A. 10:5-5(q) is very broad in its scope, Clowes v. Terminix, supra, 109 N.J. at 593, 538 A.2d 794, and is not limited to "severe" disabilities. Andersen v. Exxon, supra, 89 N.J. at 494-95, 446 A.2d 486. Rather, it prohibits discrimination against those suffering from any disability. Id. at 495, 446 A.2d 486.
The parties agree that gender dysphoria is listed in the DSM-IV as a disorder. Defendants argue correctly, however, that this listing is not dispositive for classification as a disability under the LAD. Merely because a condition is a disorder listed in the DSM-IV does not mean it is also a handicap under the LAD. A.B.C. v. XYZ Corp., 282 N.J.Super. 494, 508, 660 A.2d 1199 (App.Div.1995) (Petrella, J.A.D., concurring).
A disorder is not necessarily the equivalent of a disease, disability, illness, or defect, especially where these terms carry legal significance. Id. at 507-08, 660 A.2d 1199 (Petrella, J.A.D., concurring). Moreover, the LAD itself does not preclude discrimination based on conduct. N.J.S.A. 10:5-2.1. In addition, the DSM-IV also *375 cautions that categorization of conditions contained in the manual "may not be wholly relevant to legal judgments, for example, that take into account such issues as individual responsibility, disability determination, and competency." DSM-IV, supra, Cautionary Statement at xxvii.
The Americans with Disabilities Act (ADA) expressly excludes "transvestism, transsexualism, pedophilia, exhibitionism, voyeurism, gender identity disorders not resulting from physical impairments, other sexual behavior disorders." 42 U.S.C.A. § 12211(b)(1). That statute also contains a requirement that the impairment be one which substantially limits a major life activity. 42 U.S.C.A. § 12102(2)(A). Our own statute does not contain such a restriction. Moreover, our own Legislature has not considered or addressed similar exclusions. A.B.C. v. XYZ, supra, 282 N.J.Super. at 508 n. 3, 660 A.2d 1199 (Petrella, J.A.D., concurring).
Other state courts, however, appear to be split on this issue when construing their own statutes. For example, a Pennsylvania court has concluded that transsexualism is not a disability under the Pennsylvania Human Relations Act because that statute requires that the disability substantially limit a major life activity and because petitioner did not contend that transsexualism affected any bodily function. Holt v. Northwest Pa. Training P'ship Consortium, Inc., 694 A.2d 1134, 1139 (Pa.Commw.Ct.1997).
A Washington state court, however, has construed gender dysphoria as a handicap under the Washington Law Against Discrimination, finding that it is a medically cognizable and diagnosable condition, that those who suffer from it endure great mental and emotional agony, and that it has a prescribed course of treatment. Doe v. Boeing Co., 121 Wash.2d 8, 846 P.2d 531, 535-36 (1993).
An Iowa court reached the contrary conclusion construing its statute which also contains a "major life activity" restriction. Sommers v. Iowa Civil Rights Comm'n, supra, 337 N.W.2d at 475. The court noted that a person who is anatomically of one sex but psychologically and emotionally of the other sex has a problem that does not necessarily constitute the kind of mental condition that the Legislature intended to be treated as a substantial handicap. Id. at 476. Transsexualism should not ordinarily affect a person's capacity to engage in major life activities. Ibid.
Our problem with the out-of-state cases concluding that gender dysphoria is not a disability is that our statute is very broad and does not require that a disability restrict any major life activities to any degree. In Olson v. Gen. Elec. Astrospace, 966 F.Supp. 312 (D.N.J.1997), for example, the federal court found that plaintiff's conditions of depression and multiple personality disorder were recognized disabilities under the LAD because they were demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques, because these ailments were generally understood by the medical profession as diseases, and because the plaintiff had sought legitimate treatment for them. Id. at 315.
Our courts have held that the LAD recognizes as disabilities such conditions as alcoholism, Clowes v. Terminix, supra, 109 N.J. at 593-94, 538 A.2d 794; obesity, Gimello v. Agency Rent-A-Car, supra, 250 N.J.Super. at 361-62, 594 A.2d 264; and substance abuse, In re Cahill, 245 N.J.Super. 397, 400, 585 A.2d 977 (App. Div.1991). The LAD has thus been broadly and liberally construed to include what otherwise might be termed emotional or mental disorders, in order to eradicate the evil of discrimination in New Jersey. "Employment discrimination due to sex or *376 any other invidious classification is peculiarly repugnant in a society which prides itself on judging each individual by his or her merits." Peper v. Princeton Univ. Bd. of Trs., 77 N.J. 55, 80, 389 A.2d 465 (1978).
Gender dysphoria is regarded medically as a "mental disorder occurring in an estimated frequency of 1:50,000 individuals." Cole, Emory, Huang, Meyer, Treatment of Gender Dysphoria, 90 Tex. Med. 68 (1994). Moreover, treatment for the disorder can now "be regarded as accepted medical practice." Ibid. See also Farmer v. Brennan, 511 U.S. 825, 829, 114 S.Ct. 1970, 1975, 128 L.Ed.2d 811, 820 (1994) (transsexualism is a rare psychiatric disorder in which a person feels persistently uncomfortable about his or her anatomical sex and seeks medical treatment including hormonal therapy and surgery to bring about permanent sex change) (citations omitted).
The disorder is recognized within DSM-IV, thus confirming that the condition can be diagnosed by accepted clinical techniques. In fact, the DSM-IV lists four criteria necessary for diagnosing a gender identity disorder. Furthermore, gender dysphoria does not cause violations of the law as does exhibitionism, which was the DSM-IV disorder Judge Petrella struggled with in A.B.C. v. XYZ, supra, 282 N.J.Super. at 506-09, 660 A.2d 1199; N.J.S.A. 2C:14-4.
The DSM-IV also notes that each recognized disorder contained within the manual "is associated with present distress (e.g., a painful symptom) or disability (i.e., impairment in one or more important areas of functioning) or with a significantly increased risk of suffering death, pain, disability, or an important loss of freedom." DSM-IV, supra, at xxi. With regard to gender dysphoria specifically, the manual notes that the "disturbance causes clinically significant distress or impairment in social, occupational, or other important areas of functioning." DSM-IV, supra, § 302.85 at 537-38. Transsexualism can be accompanied by a profound sense of loathing for an individuals's primary and secondary sexual characteristics, which is overwhelming and unalterable. Dr. L. Gooren, An Appraisal of endocrine theories of homosexuality and gender dysphoria. In: Handbook of Sexology vol. 6, 410-24 (Sitsen JMA, Amsterdam, Elsevier Science Publishers 1988). Thus, gender dysphoria is a recognized mental or psychological disability that can be demonstrated psychologically by accepted clinical diagnostic techniques and qualifies as a handicap under the LAD. N.J.S.A. 10:5-5(q).
To establish the first element of a discriminatory discharge case under the LAD, however, an employee must submit proof that he or she was handicapped. Maher v. N.J. Transit Rail Operations, Inc., 125 N.J. 455, 480-81, 593 A.2d 750 (1991); Clowes v. Terminix Int'l, Inc., supra, 109 N.J. at 596, 538 A.2d 794. Here, the dismissal of plaintiff's complaint was based solely on the motion judge's conclusion that gender dysphoria was not a handicap under the LAD. While we have concluded that gender dysphoria can constitute a handicap, we have problems with the proofs submitted by plaintiff during the summary judgment proceedings.
We note that plaintiff's proofs are not clear regarding the quality and quantity of impairment plaintiff may have suffered from this disorder. While the LAD does not require proof that some major life activity was impaired, plaintiff must suffer a disability. There is some evidence that before the surgery plaintiff's stress increased and her "moods worsened." There is also evidence that before her surgery plaintiff was argumentative and had difficulty controlling her temper. Since the surgery, plaintiff acknowledged *377 experiencing greater "humanity," with her patients noting "how much more open and able to talk to me they are, particularly the adolescents."
In addition, we recognize that as part of her treatment protocol, plaintiff underwent sexual reassignment surgery, a process that most persons would not undertake unless necessary to eliminate great stress or extreme discomfort. Solely from the circumstances of plaintiff's course of treatment, we can infer sufficient impairment of plaintiff's emotional and mental well being to constitute a disability under the LAD. Plaintiff's proofs were adequate to at least raise a factual issue for summary judgment purposes establishing that her condition was a disability under the LAD. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995).
To constitute a handicap, however, the disability must also result "from anatomical, psychological, physiological or neurological conditions which ... is demonstrable... psychologically, by accepted clinical ... diagnostic techniques. N.J.S.A. 10:5-5(q). The record is completely silent on this issue.
There is an absence of evidence from Dr. Stayton confirming that he diagnosed gender dysphoria in plaintiff, explaining the condition as it manifested itself in plaintiff, and detailing the methods the doctor utilized to diagnose plaintiff. While "[n]othing ... prevents a medical doctor from testifying as an expert in [her] own case," Carey v. Lovett, 132 N.J. 44, 64, 622 A.2d 1279 (1993), evidence of her specific disorder and its diagnosis appear to be beyond plaintiff's training and specialty.
While the DSM-IV does detail the elements necessary to diagnose a gender disorder, there has been some criticism of these elements. Dr. Herbert Bower contends, for example, that the classification "neglects a number of diagnostically significant symptoms and characteristics of classical transsexualism." The doctor argues that:
The initially mentioned four criteria omit the overwhelming desire to have the genitalia altered. The symptomatology does not include important features such as masturbation with fantasy of intercourse with a person of the same anatomical gender, occasional arousal during cross-dressing in the initial phase, lack of sexual interest during adolescence, stressful puberty and an essentially normal child rearing process.
[Herbert Bower, The gender identity disorder in the DSMIV classificationa critical evaluation, at http:// www.pfc.org.uk/ congress/abstract/abs-005.html.]
Thus, to establish that she is handicapped under the LAD, plaintiff must prove that she had gender dysphoria and that the disorder was diagnosed by "accepted clinical or laboratory diagnostic techniques." N.J.S.A. 10:5-5(q). The record is silent regarding whether the diagnostic technique utilized by Dr. Stayton was "accepted."
The motion judge rejected plaintiff's complaint solely because he believed that gender dysphoria could not be a handicap under the LAD. We disagree with this assessment and reverse on that basis. Because the case must be remanded for trial on plaintiff's gender discrimination claim, we leave plaintiff to her proofs on whether she had gender dysphoria and whether her condition was diagnosed in a fashion sufficient to qualify as a handicap under the LAD.

IV.
Because the matter must be remanded, we briefly consider the other claims raised by this appeal.

*378 A.
Summary judgment was granted the Center for Family Guidance ("CFG") defendants, and plaintiff's complaint was dismissed as to them. According to plaintiff's complaint, defendant CFG was the successor to the Center and was owned by defendant James Varrell, M.D. Defendant Les Pascal was the chief financial officer of CFG. There is nothing in the summary judgment record to support plaintiff's allegation that the CFG defendants refused to hire plaintiff for her gender or any other discriminatory reasons. None of the CFG defendants ever worked with plaintiff, employed plaintiff or were parties to her employment contract. In addition, there is nothing in this record establishing that these defendants uttered any false or defamatory statements about her. Indeed, plaintiff was never involved in any business relationship or transaction with the CFG defendants. Consequently, all of plaintiff's claims against these defendants were properly dismissed.

B.
Plaintiff argues that the court erred in dismissing her claim for breach of contract. Plaintiff acknowledges that her contract permitted West Jersey to terminate her services on ninety-days notice for any reason or no reason. She nevertheless contends that the contract contained a good faith provision, and her written notice of termination also advised that she would be contacted by Cossa to discuss a new contract with Physicians' Associates, the entity which would be assuming control over the Center's program. Thus, plaintiff contends that she reasonably relied on defendants to negotiate with her in good faith leading to a new contract. This is not the kind of good faith breach that is actionable. Noye v. Hoffmann-LaRoche, Inc., 238 N.J.Super. 430, 433, 570 A.2d 12 (App.Div.), certif. denied, 122 N.J. 146, 147, 584 A.2d 218 (1990). There is no breach of any kind in this case. Nothing in plaintiff's contract required defendants to re-hire her once they chose to terminate her. Also, this claim is nothing more than her LAD claim restated as a common-law contract claim.
Plaintiff also argued that there were other provisions of her contract, such as educational leave, equipment requirements and billing procedures that were breached by defendants. As pointed out by defendants, however, plaintiff is unable to demonstrate any compensable loss to her relating to defendants' alleged "breach" of these provisions. Most, if not all, of these alleged "breaches" relate to plaintiff's displeasure regarding the manner in which the Center operated. Consequently, plaintiff's breach of contract claim was correctly dismissed.

C.
Plaintiff argues that the court erred in dismissing her claim for trade libel. Trade libel consists of communications made to a third person of false statements concerning the plaintiff, or plaintiff's property or business. Henry V. Vaccaro Constr. Co. v. A.J. DePace, Inc., 137 N.J.Super. 512, 514, 349 A.2d 570 (Law Div.1975). The communication must be made to a third person, and it must be false and play a material part in inducing others not to deal with plaintiff. Prosser & Keeton on Torts § 128 at 967 (5th ed.1984). It can include a false statement that plaintiff has gone out of business. Id. at 963. It is also essential that the plaintiff establish damages. Id. at 965.
In such an action brought against a former employer for publishing defamatory information about the employee to prospective new employers, a qualified *379 privilege extends to the defendant who responds in good faith to specific inquiries about the employee's qualifications. Kass v. Great Coastal Express, Inc., 152 N.J. 353, 355-56, 704 A.2d 1293 (1998). This privilege will be abused if the defendant knows the statement is false or acts in reckless disregard of its truth or falsity, if the publication serves a purpose contrary to the interests of the qualified privilege, or if the statement is excessively published. Id. at 356, 704 A.2d 1293.
Here, plaintiff's trade libel claim was dismissed on summary judgment, despite the fact that in opposition, plaintiff submitted two affidavits from parents of two patients who alleged that defendants had lied to them about the status of plaintiff's medical license and practice following her termination.
If plaintiff's allegations are true, she has established a prima facie case of trade libel. Whether plaintiff can ultimately prevail on this claim will depend on the proofs plaintiff can marshal regarding defendants' conduct and on whether defendants can validly assert a qualified privilege.
Defendants also argue, however, that plaintiff failed to prove that any patient chose to go elsewhere as a result of what defendants said about her. While plaintiff's damages for this tort appear, at this time, to be nebulous, we believe that plaintiff submitted sufficient opposition to withstand summary judgment. Brill v. Guardian Life Ins. Co. of Am., supra, 142 N.J. at 535, 666 A.2d 146.
The affidavits together with plaintiff's deposition testimony lead to a reasonable inference that plaintiff may have suffered some damage from defendants' alleged conduct. Plaintiff's deposition indicated that of the approximate fifty patients who communicated with her after her termination by West Jersey, she retained about half as patients. Thus, plaintiff should be given an opportunity to establish her damages, if any, through further discovery or trial, and we reinstate plaintiff's trade libel claim.

D.
Plaintiff claims that the court erred in dismissing her claims for malicious interference with economic relations and unjust enrichment. These claims were asserted in plaintiff's second complaint, the one she filed right before the court ruled on defendants' motions for summary judgment regarding her first complaint. These claims are based on the same set of facts as plaintiff's trade libel claim.
The West Jersey defendants assert that plaintiff's employment contract provided that all patients treated at the Center and all of their medical records were solely those of West Jersey. Defendants claim that the contract negates any finding that they were unjustly enriched or maliciously interfered with plaintiff's relationships with her patients because none of the patients belonged to plaintiff.
Even if the patients did not "belong" to plaintiff, the contract between West Jersey and plaintiff cannot prevent the patients from seeing any medical professional they choose. If patients who wished to continue their relationships with plaintiff were dissuaded solely because of defendants' malicious or unjust behavior, plaintiff may have valid causes of action.
These claims were rejected by the motion judge because he believed them to be "a repetition, a repackaging of the first complaint" including the trade libel claim, which had been previously dismissed. We are reinstating plaintiff's trade libel claim, and note that alternative or even inconsistent *380 pleading of viable claims is permissible. R. 4:5-6.
We conclude that plaintiff should have the opportunity to seek to amend her first complaint to add counts for unjust enrichment and interference with economic advantage. Assuming that after remand plaintiff moves to amend the complaint, the trial court shall decide whether or not to permit plaintiff to add these claims.

V.
In conclusion, the LAD "was first enacted in 1945. Its purpose is `nothing less than the eradication' of the cancer of discrimination." Lehmann v. Toys `R' Us, Inc., 132 N.J. 587, 600, 626 A.2d 445 (1993) (citing Fuchilla v. Layman, 109 N.J. 319, 334, 537 A.2d 652 (quoting Jackson v. Concord Co., 54 N.J. 113, 124, 253 A.2d 793 (1969)), cert. denied sub nom., Univ. of Med. & Dentistry of N.J. v. Fuchilla, 488 U.S. 826, 109 S.Ct. 75, 102 L.Ed.2d 51, (1988)). The Legislature's goal is that only "legitimate distinctions between citizens" be made. N.J.S.A. 10:5-3. Distinctions must be made on the basis of merit, rather than skin color, age, sex or gender, or any other measure that obscures a person's individual humanity and worth. This case represents another step toward achieving what has thus far been an elusive goal.
With respect to the West Jersey defendants, we reverse the dismissal of plaintiff's claims for sex discrimination and trade libel and affirm the dismissal of plaintiff's breach of contract claim. We reinstate the sex discrimination and trade libel claims and remand the case for further proceedings. With regard to plaintiff's claim for handicap discrimination, we reverse the dismissal of plaintiff's claim and conclude that gender dysphoria can be a handicap under the LAD. We remand the handicap discrimination claim so plaintiff can attempt, if she wishes, to establish her cause of action in accordance with the guidance we have provided. On remand, plaintiff may seek to amend her complaint to add claims for malicious interference and unjust enrichment, and the trial court shall decide whether to grant or deny this motion. We take no position on the merits of such a motion.
We affirm the dismissal of all claims brought against the CFG defendants.
Affirmed in part, reversed in part and remanded.