914 A.2d 402 (2007)
390 N.J. Super. 89
In re ADOPTION OF UNIFORM HOUSING AFFORDABILITY CONTROLS by the New Jersey Housing and Mortgage Finance Agency.
Superior Court of New Jersey, Appellate Division.
Argued October 25, 2006.
Decided January 25, 2007.
*403 Peter J. O'Connor argued the cause for appellant, Fair Share Housing Center (Mr. O'Connor and Kevin D. Walsh, Buffalo, NY, on the brief).
Donald M. Palombi, Deputy Attorney General, argued the cause for respondent, New Jersey Housing and Mortgage Finance Agency (Stuart Rabner, Attorney General, attorney; Michael J. Haas, Assistant Attorney General, of counsel; Robert J. Shaughnessy, Deputy Attorney General, on the brief).
Before Judges CUFF, WINKELSTEIN and BAXTER.
The opinion of the court was delivered by
WINKELSTEIN, J.A.D.
In this appeal, we address a challenge by plaintiff, Fair Share Housing Center (Fair Share), to the promulgation of N.J.A.C. 5:80-26, a regulation enacted by the New Jersey Housing and Mortgage Finance Agency (HMFA). The regulation establishes affordability ranges for the *404 provision of housing pursuant to the Mount Laurel doctrine.[1] The HMFA implements the requirements of the New Jersey Fair Housing Act, N.J.S.A. 52:27D-301 to -329(FHA), which was enacted to further the goals of the Mount Laurel decisions. See In re Twp. of Warren, 132 N.J. 1, 12, 622 A.2d 1257 (1993). The FHA in turn created the New Jersey Council on Affordable Housing (COAH) to provide an administrative mechanism for implementing the Mount Laurel doctrine. In re Six Month Extension of N.J.A.C. 5:91-1 et seq., 372 N.J.Super. 61, 70, 855 A.2d 582 (App.Div.2004), certif. denied, 182 N.J. 630, 868 A.2d 1033 (2005). COAH incorporated the HMFA affordability ranges established in N.J.A.C. 5:80-26 into its third-round regulations.[2]N.J.A.C. 5:94-7.1.
The gravamen of Fair Share's argument is that the affordability ranges exclude housing opportunities for lower-income households. COAH has not joined in the appeal; it relies on HMFA's brief to support its decision to incorporate HMFA's affordability regulations into its own regulations.[3]
Having reviewed the challenged regulation in light of the policies underlying the FHA and the Mount Laurel decisions, and according the challenged regulation a presumption of reasonableness and validity, we conclude that it is not inconsistent with the agency's legislative mandate, and is not arbitrary, capricious, or unreasonable. We therefore determine that the regulation is valid.

I. Background
The New Jersey Constitution requires every developing municipality, through its land use ordinances, to provide a realistic opportunity for the construction of its fair share of the region's low and moderate income housing needs. Mount Laurel I, supra, 67 N.J. at 174-75, 179-81, 187, 336 A.2d 713. Because the urban poor were disadvantaged by exclusionary zoning practices, the Court required every municipality, in its land use regulations, to provide a realistic opportunity for decent, affordable housing for the resident poor occupying dilapidated housing. Id. at 171-73, 214, 336 A.2d 713.
In Mount Laurel II, supra, the Court reaffirmed the Mount Laurel doctrine. See 92 N.J. at 199, 214-15, 456 A.2d 390. There, the Court also noted that municipalities were required to address not only the housing needs of their own citizens, but also the housing needs "of those residing outside of the municipality but within the region that contributes to the housing demand within the municipality." Id. at 208-09, 456 A.2d 390.
"The core of [Mount Laurel I and II] is that every municipality, not just developing municipalities, must provide a realistic, not *405 just a theoretical, opportunity for the construction of lower-income housing." Holmdel Builders Ass'n v. Twp. of Holmdel, 121 N.J. 550, 562, 583 A.2d 277 (1990). "That Mount Laurel II contemplated that affordable housing would include units affordable by low income households is incontestable." Toll Bros., Inc. v. Twp. of W. Windsor, 173 N.J. 502, 571, 803 A.2d 53 (2002) (Stein, J., concurring in part and dissenting in part).
Following the Mount Laurel decisions, the Legislature acknowledged the constitutional obligation of growth area municipalities to provide realistic opportunities for the housing needs of low and moderate income families by enacting the FHA. See Twp. of Warren, supra, 132 N.J. at 12, 622 A.2d 1257. To implement the Mount Laurel doctrine, the FHA directed COAH to divide the State into housing regions, estimate the present and prospective need for low- and moderate-income housing at both the state and regional levels, and adopt criteria and guidelines that would enable a municipality to determine its fair share of its region's present and prospective housing needs. N.J.S.A. 52:27D-307. The FHA also permitted municipalities to transfer up to fifty percent of their fair share obligations to other municipalities in the region by entering into a Regional Contribution Agreement (RCA) with the other municipality. N.J.S.A. 52:27D-312a; see also Hills Dev. Co. v. Twp. of Bernards, 103 N.J. 1, 47 n. 13, 510 A.2d 621 (1986) (upholding validity of RCA's); In re Twp. of Warren, 247 N.J.Super. 146, 165, 588 A.2d 1227 (App.Div.1991) (same), rev'd on other grounds, 132 N.J. 1, 622 A.2d 1257 (1993); Morris County Fair Hous. Council v. Boonton Twp., 209 N.J.Super. 393, 431-32, 507 A.2d 768 (Law Div.1985) (same), aff'd. in part and rev'd in part sub. nom., Hills Dev. Co., supra, 103 N.J. 1, 510 A.2d 621.
The State Planning Act, N.J.S.A. 52:18A-196 to -207, charged the State Planning Commission with the task of adopting a plan for the growth, renewal, development and conservation of the State and with identifying areas for growth, conservation, agriculture, open space and other appropriate designations. N.J.S.A. 52:18A-199(a). The State Plan is designed to be used as a tool for assessing appropriate locations for infrastructure, housing and conservation, but it is not binding on municipalities and is not intended to validate or invalidate specific ordinances. See Bailes v. Twp. of E. Brunswick, 380 N.J.Super. 336, 358-59, 882 A.2d 395 (App. Div.), certif. denied, 185 N.J. 596, 889 A.2d 443 (2005); Mount Olive Complex v. Twp. of Mount Olive, 340 N.J.Super. 511, 543-44, 774 A.2d 704 (App.Div.2001), remanded on other grounds, 174 N.J. 359, 807 A.2d 192 (2002).
Under the FHA, it is COAH's responsibility to adopt criteria and guidelines for municipal adjustment of the present and prospective fair share, based on available vacant and developable land, as well as infrastructure considerations or environmental factors, and to see that the pattern of development is not inconsistent with the planning designations in the State Plan, supra, N.J.S.A. 52:18A-196 to -207. N.J.S.A. 52:27D-307c(2)(e). The State Planning Commission must provide COAH with annual economic growth and development projections for each housing region, and COAH must develop procedures for periodically adjusting regional need calculations based upon the amount of affordable housing generated through any federal, state, municipal or private housing program. N.J.S.A. 52:27D-307e.
To implement its mandate, COAH developed regulations. Its first-round regulations extended from 1987 through 1993, and its second round regulations covered a *406 cumulative period from 1987 through 1999. See In re Six Month Extension, supra, 372 N.J.Super. at 74, 855 A.2d 582. In May 1999, COAH readopted the second-round substantive regulations, establishing an expiration date of May 2004. Ibid.
COAH first proposed third-round substantive and procedural regulations in October 2003. 35 N.J.R. 4636(a) (October 6, 2003) (substantive regulations); 35 N.J.R. 4700(a) (October 6, 2003) (procedural regulations). On April 27, 2004, the Supreme Court denied a petition for certification of a challenge to the absence of final third-round substantive regulations, taking judicial notice that COAH's proposed regulations would expire if not adopted by October 6, 2004. In re Failure of N.J. Council on Affordable Hous., 180 N.J. 148, 849 A.2d 182 (2004).[4]
In response to extensive comments, COAH re-proposed both the substantive regulations (N.J.A.C. 5:94) and the procedural regulations (N.J.A.C. 5:95) in August 2004. 36 N.J.R. 3691(a) (August 16, 2004) (substantive rules); 36 N.J.R. 3851(a) (August 16, 2004) (procedural rules). Following the receipt of many additional comments, COAH adopted the substantive and the procedural rules on December 20, 2004. 36 N.J.R. 5748(a) (December 20, 2004) (substantive rules); 36 N.J.R. 5895(a) (December 20, 2004) (procedural rules). As noted, as part of its third-round regulations, COAH incorporated the HMFA regulation that is being challenged in this appeal.
Three agencies, COAH, the Department of Community Affairs (DCA), and the HMFA each adopted distinct sets of rules establishing controls on the continuing affordability of housing constructed pursuant to the FHA. See N.J.A.C. 5:93-9.1 to -9.17; N.J.A.C. 5:43-4.1 to -4.10; N.J.A.C. 5:80-26.1 to -26.26; 36 N.J.R. 3655, 3659 (August 16, 2004). To remedy inconsistent and overlapping aspects of those regulations, in 2001, the HMFA repealed its rules and replaced them with the Uniform Housing Affordability Controls (UHAC), N.J.A.C. 5:80-26.1 to -26.26, 33 N.J.R. 230(a) (January 16, 2001), 33 N.J.R. 3432(b) (October 1, 2001), which were also adopted by COAH, N.J.A.C. 5:93-9.17, and by the DCA for its Balanced Housing program, N.J.A.C. 5:43-4.10. 36 N.J.R. 3655, 3659 (August 16, 2004).
The HMFA proposed amendments to its UHAC regulations, N.J.A.C. 5:80-26, in August 2004, 36 N.J.R. 3655-91 (August 16, 2004), and adopted those changes in December 2004. 36 N.J.R. 5713-47 (December 20, 2004). These amendments, which included the regulation challenged here, were intended to
transform UHAC into a single regulatory scheme for COAH, Balanced Housing, UHORP and MONI [the HMFA's Urban Homeownership Recovery Program and Market Oriented Neighborhood Investment program] units that will be available to both State and municipal affordable housing administrators. The rule proposal also presents an array of new enforcement tools that assist State and municipal officials in monitoring and ensuring compliance with UHAC. The rule proposal also permits municipalities to preserve affordable housing beyond the 30-year and 10-year control periods currently in effect under UHAC.
The social impact of the adoption of the Uniform Controls, therefore, will be to more effectively preserve housing *407 units created for low- and moderate-income families in New Jersey.
[36 N.J.R. 3659 (August 16, 2004).]
The HMFA's UHAC rules aimed to ensure that affordable housing units restricted to persons with low or moderate incomes (restricted units) would remain occupied by persons meeting those income levels. 36 N.J.R. 3655, 3660 (August 16, 2004). The rules established purchasers' income eligibility standards and maximum sales prices for purchase of restricted units, and tenants' income eligibility standards and maximum rental charges for rental of restricted units. 36 N.J.R. 3661 (August 16, 2004). The 2004 amendments introduced the term "affordability average," which was defined to mean the same thing that "range of affordability" meant under the previous version of the UHAC rules. 36 N.J.R. 3655 (August 16, 2004). The new definition reads:
"Affordability average" means an average of the percentage of median income at which restricted units in an affordable development are affordable to low- and moderate-income households. For example, if the rents for the five restricted rental units in an affordable housing development were affordable at 46, 48, 50, 52 and 54 percent of median income, respectively, the average affordability for . . . those units would be 50 percent of median income.
[36 N.J.R. 3660 (August 16, 2004).]
Affordability averages were addressed in two sections of the amended UHAC regulations, one for rental units and one for ownership units:
(d) Municipalities shall establish by ordinance that the maximum rent for affordable units within each affordable development shall be affordable to households earning no more than 60 percent of median income. The municipal ordinance shall require that the average rent for low- and moderate-income units be affordable to households earning no more than 52 percent of median income. The developers and/or municipal sponsors of restricted rental units shall establish at least one rent for each bedroom type for both low-income and moderate-income units, provided that at least 10 percent of all low- and moderate-income units shall be affordable to households earning no more than 35 percent of median income.
(e) The maximum sales price of restricted ownership units within each affordable development shall be affordable to households earning no more than 70 percent of median income. Each affordable development must achieve an affordability average of 55 percent for restricted ownership units. In achieving this affordability average, moderate-income ownership units must be available for at least three different prices for each bedroom type, and low-income ownership units must be available for at least two different prices for each bedroom type.
[N.J.A.C. 5:80-26.3(d)-(e).]
The fifty-two percent affordability average for rental units and the fifty-five percent affordability average for ownership units were unchanged from the prior version of the UHAC regulations. See 36 N.J.R. 3661 (August 16, 2004). Added to the regulation was the last sentence of subsection (d), which requires that "at least 10 percent of all low- and moderate-income units shall be affordable to households earning no more than 35 percent of median income." See ibid.; N.J.A.C. 5:80-26.3(d).
The HMFA received several comments on the affordability averages for the December 2004 UHAC rule amendments. Fair Share submitted comments to both *408 COAH and HMFA. Several comments, answered by the HMFA, were aimed at urging the HMFA to adopt a lower affordability average.[5] These comments and responses constitute a significant portion of the record on appeal. In part, they include:
COMMENT: Lowest tier of rental units should go from 35 percent to 30 percent. Affordability averages should be lower. Affordability average for ownership and rental units should go from 55 percent to 52 percent in order to help provide affordable housing to more people with the greatest need.
RESPONSE: [The] comments suggest that the UHAC should require municipalities and, therefore, private developers to produce housing units that are affordable to lower income households. It must be noted that the proposed UHAC goes further than any previous UHAC and beyond any Federal mandate or guideline to reach lower income households. For the first time, a provision is included that requires 10 percent of units in a rental development to be affordable to households at or below 35 percent of median income. That being said, the UHAC must continue to balance multiple policy objectives and the need for lower income affordable housing with the resources to produce such housing. In no way does UHAC prohibit or discourage developers or municipalities from developing housing for lower income households.
The Agency has relied on the experiences of affordable housing finance professionals and years of affordable housing lending to identify the target affordability averages. Some of the considerations include: 1) if rents are set below the cost to operate the unit, then the unit will quickly fall into disrepair and become abandoned or [un]inhabitable, 2) if private developers are unable to cross subsidize the low income units with proceeds from the higher income units the projects will not be feasible, 3) if the State uses more of its subsidy resources to reach lower income households, then fewer households meeting the statutory definition of low and moderate income will receive housing. Therefore, the Agency does not believe that lowering affordability averages or targets below those proposed in the current rules is feasible at this time.
[36 N.J.R. 5714 (December 20, 2004) (emphasis added).]
The HMFA's response continues, indicating that with regard to "COAH-eligible" units pursuant to the FHA,
low- and moderate-income housing is defined as housing reserved for occupancy by households with a gross household income equal to or less than 80 percent of the median gross household income for households of the same size within the housing region in which the housing is located. The Council's income limits are based on the uncapped Section 8 income limits published by HUD for Primary Metropolitan Statistical Area (PMSA). The Council's requirement in the proposed rules that at least 50 percent of a municipality's growth share obligation be affordable to households with a gross household income equal to or less than 50 percent of the median income for the region is therefore consistent with the FHA.
Additionally, the Council is not empowered to require municipalities to *409 subsidize affordable housing with municipal funds. A municipality that so chooses may require the private sector to build low- and moderate-income units. In fact, the private sector has built the majority of the low- and moderate-income units. While the Council shares the commenter's interest in making housing more affordable, the Council also recognizes that requiring deeper subsidies in order to produce low- and moderate-income housing limits the ability to produce affordable housing. Therefore, the Council does not believe requiring a certain percentage of units to be affordable to very low-income households is a feasible strategy at this time.
Nevertheless, it should also be noted that the proposed amendments to UHAC require that at least 10 percent of all rental units in a development be affordable to household [sic] earning 35 percent of median income. N.J.A.C. 5:80-26.3(d). The Council has adopted these affordability standards in N.J.A.C. 5:94.
Finally, the draft 2004-2008 Consolidated Plan represents the Department of Community Affairs' strategy to prioritize and implement its Federal and State housing programs to benefit the citizens of New Jersey. These programs range from rental assistance to housing rehabilitation and new construction subsidies, helping thousands of very low-income families. The State Section 8 rental assistance program, for instance, is a new program that has been created to assist this population, and is entirely reserved for households earning under 40 percent of regional median income.
[36 N.J.R. 5714 (December 20, 2004) (emphasis added).][6]

III
Fair Share contends that the HMFA affordability rules fail to meet HMFA's constitutional obligation under the Mount Laurel doctrine to benefit both low- and moderate-income households. It relies heavily on Justice Stein's opinion in Toll Brothers, supra, 173 N.J. at 569, 803 A.2d 53 (Stein, J., concurring in part and dissenting in part), in which he noted that COAH's affordability regulations "do not require that any housing constructed in inclusionary developments be affordable by households earning less than forty percent of median income." Further, Fair Share asserts that despite the Court's comment in that decision that review of the affordability issue should await a "fully developed record," id. at 565, 803 A.2d 53, neither COAH nor the HMFA honored Fair Share's request to develop such a record in enacting these regulations. It argues that no studies or analyses supported the affordability ranges.
To succeed in this appeal, Fair Share must meet a heavy burden. "[W]e accord an administrative regulation a presumption of reasonableness and validity." Twp. of Warren, supra, 132 N.J. at 26, 622 A.2d 1257. "`Our strong inclination, based on the principle that the coordinate branches of government should not encroach on each other's responsibilities, is to defer to agency action that is consistent with the legislative grant of power.'" Ibid. (quoting Lower Main St. Assocs. v. N.J. Hous. & Mortgage Fin. Agency, 114 N.J. 226, 236, 553 A.2d 798 (1989)). "`Courts . . . [should] act only in those rare circumstances when it is clear that *410 the agency action is inconsistent with the legislative mandate.'" Ibid. (quoting Williams v. Dep't of Human Servs., 116 N.J. 102, 108, 561 A.2d 244 (1989)). Administrative agencies have "wide discretion in selecting the means to fulfill the duties that the Legislature delegated to them" and "[c]ourts normally defer to that choice so long as the selection is responsive to the purpose and function of the agency." Texter v. Dep't of Human Servs., 88 N.J. 376, 383, 385-86, 443 A.2d 178 (1982).
In reviewing administrative actions, the judicial role is "restricted to four inquiries: (1) whether the agency's decision offends the State or Federal Constitution; (2) whether the agency's action violates express or implied legislative policies; (3) whether the record contains substantial evidence to support the findings on which the agency based its action; and (4) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
[George Harms Constr. Co. v. N.J. Tpk. Auth., 137 N.J. 8, 27, 644 A.2d 76 (1994).]
The principle of judicial deference to agency action is considered particularly applicable to a court's review of administrative regulations adopted by COAH to implement the FHA. Twp. of Warren, supra, 132 N.J. at 27, 622 A.2d 1257. The FHA vests COAH with "primary jurisdiction" over the administration of housing obligations, and COAH's power "is extremely broad." Holmdel, supra, 121 N.J. at 577, 583 A.2d 277 (quoting N.J.S.A. 52:27D-304(a) and Hills Dev. Co., supra, 103 N.J. at 32, 510 A.2d 621). "It cannot be overstressed that the Legislature, through the FHA, intended to leave the specific methods of compliance with Mt. Laurel in the hands of COAH and the municipalities, charging COAH with the singular responsibility for implementing the statute and developing the state's regulatory policy for affordable housing." Id. at 576, 583 A.2d 277.
The process of administrative rulemaking does not require findings of fact sufficient to justify the regulations. Heir v. Degnan, 82 N.J. 109, 119, 411 A.2d 194 (1980). Instead, facts "sufficient to justify the regulation must be presumed. The burden is not upon the Commissioner [or administrative agency] to establish that the requisite facts exist[;][r]ather, the burden is on the petitioners to establish that they do not." In re Adoption of N.J.A.C. 10:52-5.14(d)2 and 3, 276 N.J.Super. 568, 575, 648 A.2d 509 (App.Div.1994) (quoting Consolidation Coal Co. v. Kandle, 105 N.J.Super. 104, 114, 251 A.2d 295 (App. Div.), aff'd o.b., 54 N.J. 11, 252 A.2d 403 (1969)), certif. denied, 142 N.J. 448, 663 A.2d 1355 (1995). As we have previously explained:
Findings may be based on an agency's expertise, without supporting evidence, and findings resting on an agency's expertise may be especially important to the judicial review process when the court does not share the agency's expertise. This is especially true of determinations which, as here, are primarily of a judgmental or predictive nature.
[In re Regulation of Operator Serv. Providers, 343 N.J.Super. 282, 332, 778 A.2d 546 (App.Div.2001) (citations and quotations omitted).]
Against these deferential standards, Fair Share has not met its burden. It is COAH, not the HMFA, that has the primary responsibility to implement the Mount Laurel doctrine. See Holmdel, supra, 121 N.J. at 577, 583 A.2d 277. HMFA's role under the FHA is more constrained *411  it is to complement COAH's interpretation of the Mount Laurel doctrine, not to supersede it. In re Adoption of the 2003 Low Income Hous. Tax Credit Qualified Allocation Plan, 369 N.J.Super. 2, 40, 848 A.2d 1 (App.Div.), certif. denied, 182 N.J. 141, 861 A.2d 846 (2004). As we noted earlier in this opinion, in 2001, the HMFA repealed its then existing housing affordability rules, and replaced them with the UHAC. N.J.A.C. 5:80-26.1 to -26.26; 33 N.J.R. 230(a) (January 16, 2001); 33 N.J.R. 3432(b) (October 1, 2001). The regulations establish the range of affordability, now known as the affordability average, N.J.A.C. 5:80-26.2, for low and moderate income units, also known as restricted units. N.J.A.C. 5:80-26.3; 36 N.J.R. 3655 (August 16, 2004). As currently constituted, the UHAC requires that maximum rents must be affordable to households earning no more than sixty percent of median income; nevertheless, at least ten percent of all low- and moderate-income units must be affordable to households earning no more than thirty-five percent of median income, with the average rent affordable to households earning no more than fifty-two percent of median income. N.J.A.C. 5:80-26.3(d); 36 N.J.R. 3655 (August 16, 2004). As to ownership units, the maximum sales price shall be affordable to households earning no more than seventy percent of median income; and each affordable development "must achieve an affordability average of 55 percent for restricted ownership units." N.J.A.C. 5:80-27.3(e); 36 N.J.R. 3655 (August 16, 2004).
These regulations were adopted in 2004 following publication and public comment, and were incorporated by reference into COAH's third-round regulations. The amendments changed the term "range of affordability" to "affordability average." They eliminated distinctions between units receiving COAH credits and units receiving Balanced Housing funds. See 36 N.J.R. 3655 (August 16, 2004). The change in regulations had no effect on the percentages of rental and ownership developments eligible to receive the COAH credits. They have remained at fifty-two percent and fifty-five percent, respectively, since becoming effective in 2001. Responding to public comment before the adoption of those percentages, the agency reasoned that
[a]lthough it may be desirable to lower the affordability ceiling even further, the ceiling must be balanced with the reality of the market place. A lower ceiling could negatively impact the production of housing in the for-profit community that primarily builds a combination of market and affordable units and has no access to public subsidies. [33 N.J.R. 3433 (October 1, 2001).]
From this comment it is clear that in setting the affordability ceilings for rental and ownership developments eligible to receive the COAH credits, the agency considered, but rejected, a lower ceiling. It exercised its judgment, based upon its experience and expertise in the housing field. It is not our function to second-guess that choice. Fair Share has presented no studies or analyses that would mandate a different result. While Fair Share claims that lower ceilings were appropriate and that HMFA failed to support its choices with its own data and analyses, the agency's judgment in its rule-making function is broad, and facts sufficient to justify its decision are presumed. See Heir, supra, 82 N.J. at 119, 411 A.2d 194; In re Operator Serv. Providers, supra, 343 N.J.Super. at 332, 778 A.2d 546; In re N.J.A.C. 10:52-5.14(d)2 and 3, supra, 276 N.J.Super. at 575, 648 A.2d 509. It is the party challenging the decision that has the burden to show that the decision was arbitrary, see In re N.J.A.C. 10:52-5.14(d)2 and 3, supra, 276 N.J.Super. at 575, 648 A.2d 509, and *412 here, Fair Share has not made the requisite showing.
It is also significant that in enacting the 2004 amendments three years after establishing the percentages, HMFA included a new provision, which required ten percent of the units in a rental development to be affordable to households at or below thirty-five percent of median income. That appears to include a large segment of low-income individuals not previously encompassed by the round one or round two affordability ranges. We cannot say that simply because the agency may be able to lower the ceiling even further, the regulations as promulgated are clearly erroneous or are not consistent with the policies underlying the FHA.
Fair Share claims that the affordability averages were enacted without a sufficient record to support the percentages. We reiterate that the administrative rulemaking process does not require findings of fact to justify the regulations, Heir, supra, 82 N.J. at 119, 411 A.2d 194, and facts sufficient to justify regulations are presumed. In re N.J.A.C. 10:52-5.14(d)2 and 3, supra, 276 N.J.Super. at 575, 648 A.2d 509. That the record is not as expansive as Fair Share argues it should have been is not a sufficient ground to set aside the regulation. Public comments and responses to those comments were considered when the percentages were determined at the time the 2001 regulations were enacted. In conjunction with the 2004 amendments, the agency specifically responded to public comments that the lowest tier of affordable rental and ownership units should be reduced.
All three comments suggest that the UHAC should require municipalities and, therefore, private developers to produce housing units that are affordable to lower income households. It must be noted that the proposed UHAC goes further than any previous UHAC and beyond any Federal mandate or guideline to reach lower income households. For the first time, a provision is included that requires 10 percent of units in a rental development to be affordable to households at or below 35 percent of median income.

[36 N.J.R. 5714 (December 20, 2004) (emphasis added).]
That response was essentially incorporated into the new rules which did, in fact, require that ten percent of the rental units be affordable to those with household incomes below thirty-five percent of median income. N.J.A.C. 5:80-26.3(d).
HMFA has experience with affordable housing finance programs. The agency
relied on the experiences of affordable housing finance professionals and years of affordable housing lending to identify the target affordability averages. Some of the considerations include: 1) if rents are set below the cost to operate the unit, then the unit will quickly fall into disrepair and become abandoned or [un]inhabitable, 2) if private developers are unable to cross subsidize the low income units with proceeds from the higher income units the projects will not be feasible, 3) if the State uses more of its subsidy resources to reach lower income households, then fewer households meeting the statutory definition of low and moderate income will receive housing. Therefore, the Agency does not believe that lowering affordability averages or targets below those proposed in the current rules is feasible at this time.
[36 N.J.R. 5714 (December 20, 2004).]
Given the agency's experience in the affordable housing area, its actions are entitled to our deference. We are guided by the principles set forth by the New Jersey Supreme Court in Twp. of Warren, supra, that "the coordinate branches of *413 government should not encroach on each other's responsibilities . . . [but rather should] defer to agency action that is consistent with the legislative grant of power." 132 N.J. at 26, 622 A.2d 1257. Here, the agency's actions in enacting the affordability ranges are consistent with the Mount Laurel and FHA goals of providing affordable housing to low-income households. Under these circumstances, the challenged regulation, while it does not go as far as Fair Share would like, is entitled to our deference.
Fair Share argues that under the third-round COAH regulations, municipalities have no obligation to provide rental housing within the municipality, thus nullifying the challenged regulation that requires ten percent of units in a rental development to be affordable to households at or below the thirty-five percent median income level. In this regard, Fair Share claims the use of an RCA is a means for municipalities to abrogate their responsibilities to provide low-income housing. That argument is misplaced. RCA's have been approved as a valid tool for a municipality to use to comply with its Mount Laurel obligations. See Hills Dev. Co., supra, 103 N.J. at 47 n. 13, 510 A.2d 621 (upholding validity of RCA's); Twp. of Warren, supra, 247 N.J.Super. at 163-65, 588 A.2d 1227 (same); Morris County Fair Hous. Council, supra, 209 N.J.Super. at 431-32, 507 A.2d 768 (same); see also In re 2003 Low Income Hous. Tax Credit Qualified Allocation Plan, supra, 369 N.J.Super. at 41, 848 A.2d 1 ("[i]f a municipality has satisfied its fair share obligation through, for example, zoning for inclusionary development and RCAs, then it has satisfied the Mount Laurel doctrine"). Furthermore, as we point out in our companion opinion, if RCA's have been abused, "it is incumbent upon Fair Share to identify the RCAs that have been improperly approved or inadequately monitored or enforced." In re the Adoption of N.J.A.C. 5:94 and 5:95, supra, 390 N.J. Super. at 81, 914 A.2d at 397.
Fair Share also claims that state and federal subsidies should be available to leverage private developers' investments. That may be so, but that argument goes beyond the scope of this appeal. For example, HMFA pointed out in its response to comments to the proposed 2004 amendments that
the draft 2004-2008 Consolidated Plan represents the [DCA's] strategy to prioritize and implement its Federal and State housing programs to benefit the citizens of New Jersey. These programs range from rental assistance to housing rehabilitation and new construction subsidies, helping thousands of very low-income families. The State Section 8 rental assistance program, for instance, is a new program that has been created to assist this population, and is entirely reserved for households earning under 40 percent of regional median income.
[36 N.J.R. 5714 (December 20, 2004).]
In other words, there exist government programs that provide for housing for the poor. How those programs are administered, and how the funding is allocated, goes beyond the specific regulation that is the subject of this appeal.
Fair Share further asserts the regulation is invalid because HMFA failed to address the inability of a developer to obtain both density bonuses and tax credits. This too goes beyond the scope of the regulation challenged on appeal. The relevant regulations read as follows:
(b) If a municipality has created a density bonus subsidy to assist the low- or moderate-income units in a project, the project may not receive volume cap credits unless the subsidy is insufficient to assure the financial feasibility of the *414 project. This subsection shall not be evaded by failing to apply all or any portion of the subsidy to the low- or moderate-income units, by diverting all or any portion of the subsidy to other uses or by using any other device in which all or any portion of the subsidy is not used to benefit low- or moderate-income housing.
[N.J.A.C. 5:80-33.9(b).]
(a) If a municipality has created a density bonus subsidy to assist the low- or moderate-income units in a project, the project may not compete for tax credits (ceiling tax credits). This subsection shall not be evaded by failing to apply all or any portion of the subsidy to the low- or moderate-income units. . . .
[N.J.A.C. 5:80-33.12(a).]
These provisions are included in HMFA's tax credit rules, N.J.A.C. 5:80-33.1 to -33.37, not in the UHAC. The prohibition of the use of density bonuses with tax credits is, therefore, outside the scope of the rules challenged in this appeal.
In sum, while Fair Share has proposed some very laudable suggestions as to steps that COAH and HMFA may take to increase the availability of rental and ownership housing for low-income individuals, its disagreement with the current regulation to achieve those goals does not establish that the HMFA regulation challenged in this appeal is inconsistent with its legislative mandate. The regulation does not offend the Mount Laurel doctrine; it is consistent with a municipality's obligation to provide opportunities for the construction of lower income housing. See Holmdel, supra, 121 N.J. at 562, 583 A.2d 277. The affordability range enacted reaches low income households. That it does not reach more low income households does not render the regulation invalid.
The regulation was enacted as part of a regulatory scheme intended to
transform UHAC into a single regulatory scheme for COAH, Balanced Housing, UHORP and MONI [the HMFA's Urban Homeownership Recovery Program and Market Oriented Neighborhood Investment program] units that will be available to both State and municipal affordable housing administrators. The rule proposal also presents an array of new enforcement tools that assist State and municipal officials in monitoring and ensuring compliance with UHAC.
[36 N.J.R. 3659 (August 16, 2004).]
Given this purpose, and the broad exercise of judgment to which the agency is entitled, we cannot conclude that the agency clearly erred. The methods of compliance with the Mount Laurel obligation are best left to the agency with responsibility for implementing the State's regulatory policy. Holmdel, supra, 121 N.J. at 576, 583 A.2d 277.
Affirmed.
NOTES
[1] S. Burlington County NAACP v. Twp. of Mount Laurel, 92 N.J. 158, 456 A.2d 390 (1983)(Mount Laurel II); S. Burlington County NAACP v. Twp. of Mount Laurel, 67 N.J. 151, 336 A.2d 713, appeal dismissed and cert. denied, 423 U.S. 808, 96 S.Ct. 18, 46 L.Ed.2d 28 (1975)(Mount Laurel I).
[2] In a companion appeal decided this date, we address challenges to COAH's adoption of its third-round regulations. In re the Adoption of N.J.A.C. 5:94 and 5:95 by the N.J. Council on Affordable Hous., 390 N.J.Super. 1, 914 A.2d 348, 2007 WL 174115 (App.Div. 2007).
[3] The parameters of this appeal are narrowly defined. It is only the HMFA regulation that establishes affordability ranges for Mount Laurel housing, N.J.A.C. 5:80-26.1 to -26.26, that is challenged here. While this regulation has been adopted by COAH, we do not in this opinion address the remaining COAH third-round regulations nor do we consider the applicability of other HMFA regulations that affect low-income housing.
[4] The Court denied certification without prejudice, noting that the application could be renewed if COAH did not promulgate its regulations by the appropriate date. The petition was renewed and denied. 182 N.J. 428, 866 A.2d 984 (2005).
[5] Part of the response purports to reflect views of COAH, in addition to those of the HMFA.
[6] COAH also addressed comments relating to its adoption of the UHAC affordability range in adopting its third round regulations, using much of the same reasoning that appeared in the HMFA response. See 36 N.J.R. 5748(a) (December 20, 2004).