**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1463-23

SHAWN HYLAND,

     Petitioner-Appellant,

v.

STATE BOARD OF
EDUCATION – NOTICE OF
ACTION ON PETITIONS
FOR RULEMAKING –
MANAGING FOR EQUITY IN
EDUCATION – N.J.A.C. 6A:7,

     Respondent-Respondent.

_____

Submitted May 28, 2025 – Decided September 9, 2025

Before Judges Bishop-Thompson and Augostini.

On appeal from the New Jersey State Board of Education.

Karyn L. White (Pacific Justice Institute), attorney for appellant.

Matthew J. Platkin, Attorney General, attorney for respondents New Jersey Department of Education and the State Board of Education (Donna Arons, Assistant

Attorney General, of counsel; Ryan J. Silver, Deputy Attorney General, on the brief).

PER CURIAM

Petitioner Shawn Hyland appeals from the final determination by the New Jersey Department of Education (DOE) and the State Board of Education (State Board) denying his petition to repeal the amendments to N.J.A.C. 6A:7 (Chapter 7) adopted on August 2, 2023. The amendments eliminated gendered pronouns, utilized more inclusive language reflective of protected categories pursuant to the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -50, streamlined and clarified education rules, procedures, and operations, and updated terminology throughout Title 6A.

We conclude the State Board did not act arbitrarily, capriciously, or unreasonably by readopting Chapter 7, as amended, to update terminology in its regulatory language and to provide inclusive language to align with the LAD, and other state and federal laws. We are convinced the State Board reasonably acted within its broad rulemaking powers to prescribe regulations ensuring that all students are afforded an educationally equitable learning environment.

I.

The DOE and the State Board have the responsibility to ensure that public schools provide a "thorough and efficient" public education for all students in New Jersey. N.J. Const. art. VIII, § IV, ¶ 1; see N.J.S.A. 18A:38-1(a). In 2016, pursuant to the rules promulgated by the Commissioner of the DOE and the State Board, Chapter 7 was amended to include protections based on students' gender identity or expression. 47 N.J.R. 2411(a) (Oct. 5, 2015); 48 N.J.R. 590(b) (Apr. 4, 2016). The rules specified standards for district boards of education to use in establishing policies and procedures for the provision of educational activities and programs for all students under Article I, Paragraph 5 of the New Jersey Constitution; the LAD; and N.J.S.A. 18A:35-1 to -4.45, 18A:36-20, and 18A:38-5.1; as well as certain federal laws.

On April 3, 2023, the State Board proposed readopting Chapter 7 with amendments, including retitling the chapter "Managing for Equity in Education," in accordance with the Administrative Procedure Act (APA), N.J.S.A. 52:14B-1 to -15. 55 N.J.R. 569(a) (Apr. 3, 2023). The DOE explained Chapter 7 provides "rules governing equality and equity in educational programs to guarantee each student equal access to all educational programs, services, and benefits of their school district, regardless of the student's . . . gender identity or

expression, religion . . . ."  The notices set forth the overall objective—"to ensure school districts provide for students' basic rights to equitable treatment and services, and to a quality education."

The DOE and State Board summarized the proposed amendments and repeal of certain provisions:

> to eliminate gendered nouns and pronouns; utilize more inclusive language reflective of protected categories or classes as defined pursuant to the [LAD]; streamline and clarify rules, procedures, and operations throughout the chapter; update terminology to align to provisions throughout Title 6A of the New Jersey Administrative Code, Title 18A of the New Jersey Statutes, and evidence-based practices regarding equity in education; and remove redundant language or sections within the chapter covered under other provisions and laws.

Notably, the amendments prescribe rules to be followed by local school districts.  Relevant to this appeal, the DOE sought to amend N.J.A.C. 6A:7-1.1 "Purpose," to align with the protected categories as set forth in the LAD.  The DOE also proposed to eliminate N.J.A.C. 6A:7-1.8 "Equality in employment and contract practices," and N.J.A.C. 6A:7-1.10 "Appeals" because those provisions were covered by other laws and regulations. See N.J.S.A. 18A:6-9; see also N.J.A.C. 6A:3.

Under N.J.A.C. 6A:7-1.3 "Definitions," the DOE proposed to amend specific terms to better reflect current educational standards and practices. These proposed changes included:

- "[E]ducational equity" to state "the cohesive set emphasizes high expectations and achievement and ensures equitable access" to align the term with the definition equal.

- "[E]quity" to "mean[] students have the opportunity to master the goals of the curriculum in an educational environment that is fair, just, and impartial to all individuals" and "focuses on consistent and systematic access for all students to curriculum, resources, instruction, and environments that sustain opportunities for excellent outcomes." The term "better aligns with current terminology and evidence-based [educational] practices…." The proposed amendment would support differentiated instruction and formative assessment aligned to the New Jersey State Learning Standards.

The DOE also proposed an update to N.J.A.C. 6A:7-1.6 "Professional development," which required districts to invite parents to participate in professional development training for district staff. Rather than inviting direct parent involvement, the proposed amendment instead required districts to "ensure that parents and community members are aware of professional development training provided to school district personnel regarding topics around equity."

The DOE proposed amendments to N.J.A.C. 6A:7-1.7 " Equity in school and classroom practices," which set guidelines to ensure equity in school and classroom practices. The proposed amendments sought to address gender-specific language. Specifically, N.J.A.C. 6A:7-1.7(b)(2)(i), which permits districts to conduct portions of classes that deal exclusively with human sexuality in separate developmentally appropriate sessions for male and female students, provided the course content is the same for both groups. The amendment proposed to replace "for male and female students" with "based on gender identity" to be consistent with LAD, Title IX, and guidance by the United States Department of Education's Office for Civil Rights.

Additionally, N.J.A.C. 6A:7-1.7(d)(2),

> which allows a school district to choose to operate separate teams for the two sexes in one or more sports or single teams open competitively to members of both sexes, as long as the athletic program, as a whole, provides equal opportunities for students of both sexes to participate in sports at comparable levels of difficulty and competency.

The DOE proposed to replace the references to "two" or "both" sexes with "based on sex" or "all" sexes to ensure that all gender identities are addressed. The DOE explained this provision permits districts, at their discretion, to establish separate sports teams, provided that the overall athletic program offers

6

all students equal opportunities to participate in sports at comparable levels of difficulty and skill.

After receipt and consideration of numerous public comments, the State Board addressed those concerns, explaining that the proposed amendments "reflect[] and honor[] New Jersey's historical commitment to equity" and "implement[] the protections for students against discrimination pursuant to," among others, the LAD. See 55 N.J.R. 1877(a) (Sep. 5, 2023). In regard to its authority, the DOE explained that it is obligated under state and federal law to ensure that students are not subjected to discrimination.

In response to the public comments concerning the proposed amendments to N.J.A.C. 6A:7-1.7(b)(2)(i), the DOE clarified that school districts retain discretion to not separate classes on human sexuality, but if they choose to do so, "they must do so in a manner that complies with the [LAD] and [f]ederal anti-discrimination laws." The DOE further explained that the amendments sought to "ensure equity in education, prevent discriminatory behavior, and narrow the achievement gap by providing equity in educational activities and programs and opportunities for positive student interaction, regardless of" the student's gender identity. Lastly, the DOE noted that the amendments were the

"result of changes to the law and a collaboration with stakeholders who are experts in the field of educational equity."

On August 2, 2023, the State Board readopted Chapter 7, as amended, effective September 5, 2023. 55 N.J.R. 1877(a). The State Board reiterated its commitment to equity and obligation to prohibit discrimination under state and federal law. Ibid. The amendments were subsequently codified at N.J.A.C. 6A:7-1.1, -1.3 to -1.10.

On August 8, 2023, Hyland filed a rulemaking petition with the State Board, seeking to repeal (1) all recent amendments that eliminated gendered nouns and pronouns where their use was not intended to have a substantive effect; and (2) amendments to the revised term "equitable educational opportunity" at N.J.A.C. 6A:7-1.3, as well as at N.J.A.C. 6A:7-1.6(a)(2), 1.7(b)(2)(i), (b)(7), (d)(2). Hyland also sought to repeal certain amendments to Chapter 7, contending these amendments violate principles of the Equal Protection Clause of the Fourteenth Amendment, and the First Amendment of the United States Constitution—the Free Speech, Free Exercise, and Establishment Clauses.

Hyland also argued for an accommodation for student's religious beliefs by including new amendments permitting Christian students to opt out of any

curriculum deemed contrary to their religion. Finally, Hyland argued that certain amendments to Chapter 7 are not mandated by the LAD and otherwise infringe upon parental rights.

On September 18, 2023, the DOE published a notice in the New Jersey Register acknowledging receipt of Hyland's petition. 55 N.J.R. 2025(a) (Sep. 18, 2023). The DOE subsequently published a notice of action on November 6, 2023, stating that additional time was needed to deliberate Hyland's petition. 55 N.J.R. 2278(b) (Nov. 6, 2023).

On January 16, 2024, the DOE published a notice denying Hyland's petition for rulemaking. 56 N.J.R. 148(b) (Jan. 16, 2024). The State respondents reiterated their responses to the public comments from the rulemaking process. Ibid.

In addressing Hyland's argument that the amendments infringe upon the constitutional rights of students and parents, the State respondents concluded the amendments: "[did] not have any effect on the use of nouns and pronouns in school districts or by students, educators, or any other individuals"; and did not "establish[] a religion or prohibit the free exercise of religion." Finally, the State respondents acknowledged that "parents and guardians have always had the right to object to their children attending lessons related to health, family life

education, or sex education pursuant to N.J.S.A. 18A:35-4.7."   The present appeal by Hyland followed.[1]

II.

On appeal, Hyland asserts two principal arguments.  First, Hyland argues the State Board's action in readopting the amendments to Chapter 7 exceeded its authority and were arbitrary and capricious.

He further argues that the amendments to Chapter 7 are unconstitutional. Hyland contends that the secular definition of "gender-identity" fails to pass constitutional muster because it (1) violates the free exercise clause, right to protected free speech under the First Amendment, and the equal protection clause; (2) fails strict scrutiny; (3) fails to show how the amendments relying on the secular definition would "materially and substantially" interfere with education operations; (4) is not narrowly tailored; and (5) does not serve a compelling state interest.  Lastly, Hyland argues the amendments related to professional development violate parental rights.

---

[1]  Hyland does not appeal the denial of the new amendment to allow Christian students to opt out of any curriculum forcing them to affirm beliefs contrary to their religion.

## III.

Our review of the State Board's decision is limited in scope. We "may reverse an agency decision if it is arbitrary, capricious, or unreasonable," or "when 'it is clear that the agency action is inconsistent with its mandate.'" In re Proposed Quest Acad. Charter Sch. of Montclair Founders Grp., 216 N.J. 370, 385 (2013) (quoting In re Petitions for Rulemaking, N.J.A.C. 10:82-1.2 & 10:85-4.1, 117 N.J. 311, 325 (1989)); see also Gillespie v. Dep't of Educ., 397 N.J. Super. 545, 549 (App. Div. 2008) (quoting Williams v. Dep't of Human Servs., 116 N.J. 102, 108 (1989)).

In considering the State respondents' denial of Hyland's petition, we are guided by the well-established principle that "an agency's regulations are presumed 'valid and reasonable.'" Animal Prot. League of N.J. v. N.J. Fish and Game Council, 477 N.J. Super. 145, 160 (App. Div. 2023) (quoting N.J. Soc'y for Prevention of Cruelty to Animals v. N.J. Dep't of Agric., 196 N.J. 366, 385 (2008)). When the decision to deny a petition is consistent with the agency's legislative authority, we give deference to that decision. See Stein v. Dep't of L. and Pub. Safety, 458 N.J. Super. 91, 99-100 (App. Div. 2019).

A-1463-23

A. Rulemaking authority.

In contending the State Board exceeded its regulatory authority, Hyland argues that there is an "inconsistency" between Chapter 7 and the statute it implements because the State Board's amendments extend beyond the Legislature's intent. Hyland further contends that there is no case law, legislative guidance, or statute authorizing the changes to Chapter 7. He argues the State Board's contention that the amendments were the "result of changes to the law," is not supported by the record. Hyland specifically contends the amendments are not predicated on any recent changes to the LAD, which was amended fifteen years ago. He likewise argues that more than five years ago, the Legislature directed the DOE to develop and distribute to school districts the "Transgender Student Guidance for School Districts" as codified in N.J.S.A. 18A:36-41. We are not persuaded.

The New Jersey Constitution places the responsibility for education on the Legislature, which delegates authority to state and local entities. In re Application of Bd. of Educ., 86 N.J. 265, 277 (1981). The Education Clause of the New Jersey State Constitution, N.J. Const. art. VIII, § IV, ¶ 1, also mandates "the maintenance and support of a thorough and efficient system of free public

schools for the instruction of all children between the ages of five and eighteen years."

The Legislature has "delegated to the [DOE] and the State Board the duty 'to maintain a constant awareness of what elements at any particular time find place in a thorough and efficient system of education' and to [e]nsure the presence of 'sufficiently competent and dedicated personnel, adequately equipped.'" In re Application of Bd. of Educ., 86 N.J. at 277 (citing Robinson v. Cahill, 69 N.J. 449, 459 (1976)). Empowered as "legislative agents," the DOE and State Board exercise supervisory authority necessary to meet the mandate of the state constitution. N.J.S.A. 18A:4-10, -15; Piscataway Twp. Bd. of Educ. v. Burke, 158 N.J. Super. 436, 441 (App. Div. 1978); G.D.M. v. Bd. of Educ. of the Ramapo Indian Hills Reg'l High Sch. Dist., 427 N.J. Super. 246, 258 (App. Div. 2012).

The Legislature also empowered the State Board to "adopt rules and regulations pursuant to the 'Administrative Procedure Act,' [N.J.S.A. 52:14B-1 to -31] . . . ." In re Renewal Application of TEAM Acad. Charter Sch., 247 N.J. 46, 67-68 (2021). Simply put, the State Board is the primary policymaking body for public education in New Jersey. "[T]here can be no doubt that the [State Board] 'enjoys broad legislative rule[]making powers.'" Bd. of Educ. v.

Cooperman, 105 N.J 587, 596 (1987) (citing D.S. v. East Brunswick Twp. Bd. of Educ., 188 N.J. Super. 592, 598 (App. Div. 1983)). "Thus, the [Acting] Commissioner's interpretation of what is required under 'thorough and efficient' should be accorded certain deference." Parsippany-Troy Hills Educ. Ass'n v. Bd. of Educ., 188 N.J. Super. 161, 166 (App. Div. 1983) (citing N.J.S.A. 18A:4-25).

The amendments under review fall squarely within the purview of the broad power and supervisory authority vested within the State respondents. These amendments include general statements that aim to guarantee equal access to educational activities and programs for all public school students, as well as to streamline and clarify education rules, procedures, and operations for school districts. Each of these measures is integral to the continued operation of a thorough and efficient system of free public education.

Hyland also contends that the amendments to Chapter 7 were made without a reasonable explanation and were not prompted by any changes to the law. Hyland's arguments are simply not supported by the record.

The State Board was not required to make specific findings of fact when the amendments to Chapter 7 were adopted. See In re Adoption of Unif. Hous. Affordability Controls, 390 N.J. Super. 89, 103-04 (App. Div. 2007) (holding

"that the administrative rulemaking process does not require findings of fact to justify the regulations").  Rather, it is presumed that the facts are sufficient to justify the regulations.  <u>Id.</u> at 104.  "For 'more policy-driven, quasi-legislative acts' such as those [amendments] at issue here, 'the record may be less extensive' than the record of a contested case."  <u>In re Renewal Application of TEAM Acad. Charter Sch.</u>, 247 N.J. at 74 (citation omitted).

The record demonstrates the State Board fully articulated the rationale underlying the amendments to Chapter 7.  In doing so, the notices in the record further show the State Board received, summarized, and thoroughly responded to the public's comments—reflecting concerns, opposition, and support before adopting the amendments.  We are satisfied that those notices provided "[t]he basis for the determination" and were "'discernible from the record' considered by the [State Board]."  <u>Id.</u> at 75 (quoting <u>In re Red Bank Charter Sch.</u>, 367 N.J. Super. 462, 476 (App. Div. 2004)).

B.  Conformance with LAD.

We reject Hyland's argument that the LAD only protects persons who have obtained a diagnosis of gender dysphoria.  In support of his argument, Hyland relied extensively on <u>Enriquez v. W. Jersey Health Sys.</u>, 342 N.J. Super. 501 (App. Div. 2001).  That reliance is misplaced.  In <u>Enriquez,</u> we addressed

whether gender dysphoria or transsexualism is a handicap under the LAD. Id. at 505. Subsequent to our ruling that gender dysphoria constitutes a handicap under the LAD, id. at 522, the legislation has been amended to include gender identity and gender expression as a protected status. N.J.S.A. 10:5-12(a).

The LAD expressly bars discrimination in public accommodations on the basis of "gender identity or expression." Schiavo v. Marina Dist. Dev. Co., 442 N.J. Super. 346, 370 (App. Div. 2015). The LAD defines "[g]ender identity or expression" as "having or being perceived as having a gender related identity or expression whether or not stereotypically associated with a person's assigned sex at birth." N.J.S.A. 10:5-5(rr).

A public school is declared to be a place of public accommodation because it is under the supervision of the State Board and the DOE. N.J.S.A. 10:5-5(l); L.W. ex rel. L.G. v. Toms River Reg'l Schs. Bd. of Educ., 381 N.J. Super. 465, 485 (App. Div. 2005) (citing N.J.S.A. 10:5-5(l)). Thus, "it is undeniable that a public school curriculum is one of the 'advantages, facilities . . . [or] privileges' of a public school as a place of public accommodation" and is covered by the LAD. Hinfey v. Matawan Reg. Bd. of Educ., 77 N.J. 514, 523 (1978) (extending the New Jersey constitutional bases of proscribed discrimination to include gender in public education); N.J.S.A. 18A:36-20.

16

It is unequivocal that the State respondents possess sweeping supervisory authority to exercise their core functions—the educational programs, courses, curricula, and staff professional development in public schools. The amended regulations adopted by the State Board fulfills its constitutional mandate to provide "equitable treatment and services, and to [ensure] a quality education." We, therefore, conclude the State respondents properly exercised their rulemaking authority to amend and adopt Chapter 7 concerning educational activities and programs in the public schools.

C. Separate sports teams under Chapter 7.

In a collateral attack on the DOE's Transgender Guidance Policy, Hyland argues the State Board does not have the authority to mandate a separation of sports teams under N.J.A.C. 6A:7-1.7(d)(2), based on the secular definition of gender identity. He argues that no court has approved the Board's definition of gender identity. Hyland further argues that no legislative guidance, statute, regulation, or ordinance defines gender identity, nor provides any authoritative basis for this secular definition, which contradicts established precedential Supreme Court decisions involving the LAD and gender. Hyland's arguments lack merit.

Hyland misinterprets the LAD's definition of gender identity. The LAD makes it unlawful for schools to subject individuals to discrimination on the basis of their "gender identity or expression." N.J.S.A. 10:5-12(f)(1). The statute defines "gender identity or expression" as "having or being perceived as having a gender related identity or expression whether or not stereotypically associated with a person's assigned sex at birth." N.J.S.A. 10:5-5(rr); see also C.V. ex rel. C.V. v. Waterford Twp. Bd. of Educ., 255 N.J. 289, 311 (2023) (recognizing that a student may state a claim under the LAD for discriminatory conduct based on their gender identity or expression).

Under N.J.S.A. 18A:36-20, discrimination based on gender is precluded in public education. The statute also proscribes discrimination in athletic programs. B.C. ex rel. C.C. v. Bd. of Educ. Cumberland Reg'l Sch. Distr., 220 N.J. Super. 214, 223 (App. Div. 1987). We have construed N.J.S.A. 10:5-1 to "permit reasonable restrictions which promote important governmental objectives" in promoting equality of athletic opportunities. Id. at 227 (citing In re Katherine Frey Dickerson, 193 N.J. Super. 353 (Ch. Div. 1983)). Accordingly, we have held that the New Jersey State Interscholastic Athletic

Association's (NJSIAA)[2] regulation excluding males from female teams is constitutionally permissible under both the State and Federal Constitution, is not violative of the LAD, N.J.S.A. 18A:36-20, and its corollary regulation, N.J.A.C. 6:4-1.5(f)(2). Id. at 228.

Hyland contends the DOE's "Transgender Student Guidance for School Districts" released in 2018 does not support the State Board's argument that the amendments were made in response to the "changes in the law." The DOE issued the guidance "to assist school[] [districts] in establishing policies and procedures [to create a safe,] supportive[,] and non[-]discriminatory environment for transgender students" pursuant to the Legislature's directive. N.J.S.A. 18A:36-41.

Under N.J.S.A. 18A:11-3, the Legislature expressly permits local boards of education to join the NJSIAA. The Legislature requires the Commissioner to approve the NJSIAA's "charter, constitution, bylaws, and rules and

---

[2] The NJSIAA is a private, voluntary association comprised of approximately 440 accredited public and non-public high schools in New Jersey and is a member of the National Federation of State High School Associations. As reflected in its mission statement, "[t]he mission of the NJSIAA is to assist member schools in providing equitable education-based interscholastic athletic opportunities that support academic achievement, good sportsmanship and fair play for student athletes." Inside NJSIAA, N.J. State Interscholastic Athletic Ass'n, https://www.njsiaa.org/inside-njsiaa (last visited Aug. 29, 2025).

regulations[.]" Ibid. NJSIAA has also implemented a "Transgender Policy 2023-2024," which allows transgender students "to participate in accordance with either their birth sex or in accordance with their gender identity, but not both."[3] Thus, even if N.J.A.C. 6A:7-1.7(d)(2) establishes separate sports teams based on the biological sex of students, participation on those teams would ultimately be determined by gender identity in order to comply with NJSIAA rules.

We note that during the pendency of this appeal, the federal Department of Education filed a lawsuit against Maine, claiming its laws that permit transgender athletes to participate in girls' sports violate Title IX antidiscrimination laws.[4] Nevertheless, we consider the public schools' sports team a component of an educational activity. Based on well-established law, the State Board acted within its designated authority to promulgate regulation regarding the separation of sports teams based on gender identity.

---

[3] Transgender Policy 2023-2024, N.J. State Interscholastic Athletic Ass'n, https://www.njsiaa.org/documents/transgender-policy (last visited Aug. 26, 2025).

[4] Alana Durkin Richer et al., Trump Administration Sues Maine Over Participation of Transgender Athletes in Girls Sports, Associated Press (Apr. 16, 2025), https://apnews.com/article/maine-education-department-transgender-athletes-pam-bondi-5b5c8d0022233fae5ec60efc9fa5394f.

IV.

We next address Hyland's argument that the secular definition of "gender identity" is violative of the United States Constitution.  We reject Hyland's arguments.

A.     Free Exercise and Establishment Clauses.

Hyland argues the State Board may not establish a "religion of secularism" by adopting amendments that define gender as "indeterminate," which can be decided based on the student's feelings, resulting in the treatment of comparable secular activity more favorably than religious exercise.  He further argues the amendments force students who adhere to a "Biblical worldview," to act and operate under a law that directly contradicts those beliefs, and the students or parents are not allowed to opt out of the imposition of those beliefs.

The First Amendment's Establishment Clause bars a state from placing its support behind a religious belief, while the Free Exercise Clause bars a state from interfering with the practice of religion.  U.S. Const. amend. I; Satz v. Satz, 476 N.J. Super. 536, 552 (App. Div. 2023).  The First Amendment is applicable to the states through the Fourteenth Amendment.  Meek v. Pittenger, 421 U.S. 349, 351 (1975).  The New Jersey Constitution affords similar protections pursuant to Article I, Paragraph 4.  N.J. Const. art. I, ¶ 4.

21

Federal courts no longer apply the three-prong test articulated in Lemon v. Kurtzman, 403 U.S. 602 (1971) to determine a violation of the Establishment Clause. Kennedy v. Bremerton Sch. Dist., 597 U.S. 507, 510 (2022). We, however, consider the Lemon test to determine whether the State Board's amendments pass muster under the Establishment Clause. See Hyman v. Rosenbaum Yeshiva of N. Jersey, 258 N.J. 208, 216 (2024) (holding that the Lemon test set forth in McKelvey v. Pierce, 173 N.J. 26 (2002) is still controlling). The test requires that the amendments must: (1) "have a secular legislative purpose;" (2) have a "principal or primary effect . . . that neither advances nor inhibit religion[];" and (3) do not foster "excessive government[al] entanglement with religion." Lemon, 403 U.S. at 612. "An affirmative answer to each prong of the Lemon test is required to result in a statute's constitutional validity." New Life Gospel Church v. State, Dep't of Cmty. Affairs, Div. of Hous. Bureau of Fire Safety, 257 N.J. Super. 241, 250 (App. Div. 1992). In sum, "to pass constitutional muster, a law must have both a secular purpose and a secular effect." Aflalo v. Aflalo, 295 N.J. Super. 527, 534 (Ch. Div. 1996).

We hold the State Board's amendment satisfies the three-prong Lemon test and therefore passes constitutional muster. The public notices and the amendments unequivocally state the purpose of Chapter 7 is to ensure "all

students . . . regardless of . . . [religion] . . . are provided equal access to educational programs and services by district boards of education."  The amendments "require[] district boards of education to establish policies and procedures for the provision of educational activities and programs for all students, pursuant to laws and statutes that establish the protected categories of individuals covered by this chapter."  Those statements evince a "reasonable legislative statement announcing a colorable secular design" with the express intent to comply with statutory and regulatory laws that prohibit discrimination based both on gender and religion.  Student Members of Playcrafters v. Bd. of Educ., 177 N.J. Super. 66, 75-76 (App. Div. 1981) (citing Resnick v. E. Brunswick Twp. Bd. of Educ., 77 N.J. 88, 108 (1978)).

A fair reading of the amended chapter demonstrates the State Board does not seek to promote a "religion of secularism," nor does it create a constitutionally prohibited entanglement.  The students and parents retain the right to opt-out of any instruction related to health, family life education, or sex education or educational activity that violates their religious beliefs.  N.J.S.A. 18A:35-4.7; N.J.A.C. 6A:8-3.1(d).  Should a parent exercise to opt-out of any program or activity based on "moral or religious beliefs," the student shall be excused from that part of the instruction, and "no penalties shall result."

23

N.J.S.A. 18A:35-4.7.  Thus, the amendments do not violate either the Free Exercise or Establishment Clauses, as they apply uniformly to all students and do not seek to regulate religious conduct or belief.

B.    Free Speech.

"The First Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment, instructs that 'Congress shall make no law . . . abridging the freedom of speech.'"  State v. Higginbotham, 257 N.J. 260, 274 (2024) (omission in original) (quoting U.S. Const. amend. I).  The New Jersey Constitution further provides that "[e]very person may freely speak, write and publish sentiments on all subjects, being responsible for the abuse of that right.  No law shall be passed to restrain or abridge the liberty of speech or of the press."  N.J. Const. art. I, ¶ 6.

We are satisfied that the record establishes there is no violation of the First Amendment free speech rights.  Here, the amendments to Chapter 7 do not regulate or target the speech of students or parents.  While the amendments define gender identity, they neither compel nor coerce students or parents to endorse this definition.  Nor do they prevent students or parents from publicly expressing a different view.  In essence, the amendments establish guidelines

regarding the treatment and address the equal treatment of transgender students for education activities and curricula.

C.    Equal Protection Clause.

Hyland argues the amendments violate only the Equal Protection Clause of the United States Constitution and intentionally discriminate against other students' right to freedom of religion in favor of the "allegedly protect[ed] transgendered students' constitutional rights."

Hyland fails to recognize that New Jersey courts apply a different standard of review when analyzing equal protection claims under our State Constitution. The New Jersey Constitution does not include an explicit equal protection clause. However, our Supreme Court has interpreted the broad language of Article I, Paragraph 1 to implicitly encompass the fundamental guarantee of equal protection. Lewis v. Harris, 188 N.J. 415, 442 (2006) (citing Sojourner A. v. N.J. Dep't of Human Servs., 177 N.J. 318, 332 (2003)). Moreover, the Court recognized the "first paragraph to our State Constitution 'protect[s] against injustice and against the unequal treatment of those who should be treated alike.'" Lewis, 188 N.J. at 442 (alteration in original) (quoting Greenberg v. Kimmelman, 99 N.J. 552, 568 (1985)).

Hyland's argument that the secular definition of "gender identity" fails strict scrutiny is unpersuasive. Moreover, Hyland's reliance on <u>Tinker v. Des Moines Indep. Comm. Sch. Dist.</u>, 393 U.S. 503, 509 (1969) to support the application of a strict scrutiny test is misguided. In <u>Tinker</u>, the United States Supreme Court held that the prohibition against the armbands and the suspension of the students wearing them, in the absence of any actual disturbance or disruption, was an unconstitutional denial of the students' right of expression of opinion. <u>Id.</u> at 514.

New Jersey courts apply a three-factor balancing test when analyzing equal protection claims under our State Constitution. "That test weighs 'the nature of the affected right, the extent to which the governmental restriction intrudes upon it, and the public need for the restriction.'" <u>Caviglia v. Royal Tours of Am.</u>, 178 N.J. 460, 473 (2004) (quoting <u>Greenberg</u>, 99 N.J. at 567). "'Although . . . consideration of an equal protection claim under New Jersey's balancing test differs analytically from the rational basis test, 'the two approaches are substantially the same and will often yield the same result.'" <u>N.J. State Bar Ass'n v. State</u>, 387 N.J. Super. 24, 43 (App. Div. 2006) (quoting <u>Brown v. State</u>, 356 N.J. Super 71, 79 (App. Div. 2002)).

A-1463-23

Here, the amendments do not impose any burdens on students or parents with respect to gender identity.  Rather, as written, the amendments expressly provide that the regulations apply uniformly to all students.  The amendments simply define "gender identity" in a manner consistent with definitions the LAD, and other state and federal regulations.  The State respondents have a legitimate governmental interest, providing educational equity and preventing discrimination, which satisfies Article I, Paragraph I of our Constitution.  The State respondents, without question, have a further interest in ensuring all students receive a quality education.

When we consider the responsibility of the State respondents to establish rules, procedures, and operation for district boards of education regarding educational programs and activities, as well as the need for equitable access to curricula, the definition of "gender identity" is minimal.  The gender definition is not only rationally related to the State respondents' legitimate government goals and interests, but also rises to the level of a compelling government interest.  The amendments fully align with both federal and state equal protection guarantees.

### D. Parental Rights.

The right of a parent "to raise one's children" is a fundamental right. N.J. Div. of Child Prot. and Permanency v. D.H., 469 N.J. Super. 107, 114 (App. Div. 2021); see also Moriarty v. Bradt, 177 N.J. 84, 115 (2003) (stating it is "the fundamental right of parents to raise their children as they see fit"). This fundamental right grants parents the right "to make decisions regarding . . . health, education, and other child-welfare issues" involving their children. Fawzy v. Fawzy, 199 N.J. 456, 476 (2009); see also Troxel v. Granville, 530 U.S. 57, 66 (2000).

In certain circumstances, "the parental right to control the upbringing of a child must give way to a school's ability to control curriculum and the school environment." Dempsey v. Alston, 405 N.J. Super. 499, 512 (App. Div. 2009) (quoting C.N. v. Ridgewood Bd. of Educ., 430 F.3d 159, 182 (3d Cir. 2005)) (internal quotation marks omitted). Parents likewise lack a fundamental right to determine how public schools impart instruction to their children. Ibid. In other words, parental rights "are not absolute" and do not override the State respondents' supervisory authority over education. D.H., 469 N.J. Super. at 114 (quoting In re Guardianship of K.H.O., 161 N.J. 337, 347 (1999)) (internal quotation marks omitted).

Under N.J.A.C. 6A:7-1.6, as amended, school districts are required to provide notice to parents regarding professional development training to address student achievement gaps and equity. If parents object to a specific educational topic, they retain the right to communicate their concerns or objections to the school district and opt-out of that instructional program without penalty. We discern no infringement on the fundamental rights of parents.

To the extent not addressed, Hyland's remaining arguments lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division